# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**SHANEEKA WHITE,**
individually and on behalf of
her minor child, **K.K.,**

      Plaintiff,

v.

Case No. _____

**WHITEFISH BAY SCHOOL
BOARD**, **JOHN THOMSEN,
AMY LEVEK,** and **JULIE
HENNINGSEN,**

      Defendants.

---

## COMPLAINT

---

Plaintiff Shaneeka White, on her own behalf and on behalf of her minor child K.K.,

brings this civil rights action against Defendants Whitefish Bay School Board,

former Whitefish Bay School District Superintendent John Thomsen in his

individual capacity, Whitefish Bay High School Principal Amy Levek in her

individual capacity, and former Whitefish Bay High School Assistant Principal Julie

Henningsen in her individual capacity, for violations of Ms. White and K.K.'s rights

under the Equal Protection, Due Process and Free Speech provisions of the U.S.

Constitution, and for defamation in violation of Wisconsin tort law.

## NATURE OF ACTION

1

1.     K.K. is a Black high school student who lives and goes to school in the Whitefish Bay School District("District"). This action arises from District official's actions when white students made a false and damaging accusation against K.K.. Motivated by racial animus and their own self-interest, Defendants Thomsen, Henningsen, and Levek (collectively, "Defendant Administrators") conducted an inadequate and biased disciplinary process that subjected K.K. to a frightening police interaction, exclusion from school activities, and a damaging, untrue report in K.K.'s disciplinary record, in violation of K.K.'s rights to due process and equal protection of law. Further, when K.K.'s mother, Plaintiff Shaneeka White, tried to speak out about the Defendant Administrators' unfair and discriminatory conduct towards K.K., the Defendant Administrators and the Defendant Whitefish Bay School Board responded with actions designed to suppress Ms. White's speech in violation of the First Amendment. Defendants took these actions pursuant to unofficial District policies authorizing unfair disciplinary practices towards Black students and suppression of criticism regarding racial inequity in District schools.

2.     Defendants actions have caused K.K. and his mother severe emotional distress and reputational damage, undermining their sense of safety and belonging in their community, and with it K.K.'s ability to benefit from the opportunities available to him at school. Through this action, Ms. White seeks declaratory judgments that Defendants' practices violated the First and Fourteenth Amendments; injunctions barring the District from continuing those practices both generally and as applied to K.K.; equitable relief to restore Ms. White and K.K's

reputations and K.K.'s access to equal education opportunity; compensatory and punitive damages; and reasonable attorneys' fees and costs.

## I.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343(a)(3) (42 U.S.C. § 1983 jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

4.    The Court is authorized to order declaratory relief under 28 U.S.C. §§ 2201 and 2202.

5.    The Eastern District of Wisconsin is the proper venue for this action because the Plaintiff's claims arose within the geographical boundaries of the Eastern District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## II.    PARTIES

6.    K.K. is a minor child, a resident of Whitefish Bay, Wisconsin, and a student of the Whitefish Bay School District. His mother and next friend, Shaneeka White, pursues his claims on his behalf.

7.    Plaintiff Shaneeka White is the mother of K.K. She is an adult resident of Whitefish Bay, Wisconsin, with capacity to sue and be sued in this court.

8.    The Whitefish Bay School District ("District") is a public school district located in Whitefish Bay, Milwaukee County, Wisconsin. The District's main office is located at 1200 E. Fairmount Avenue, Whitefish Bay, WI 53217. The District is a common school district that, pursuant to the Wisconsin Constitution and state statutes, operates under the direction of the Whitefish Bay Board of Education

3

("School Board"), a seven-member elected school board which is a Defendant in this matter. The School Board designates responsibility for administration of WFBSD to the District Administrator, a role filled by Defendant John Thomsen at all times relevant to this complaint. WFBSD operates two elementary schools, one middle school (Whitefish Bay Middle School, hereinafter "Middle School"), and one high school (Whitefish Bay High School, hereinafter "High School").

9. Defendant John Thomsen was District's Superintendent until his retirement at or around the end of the 2023-24 school year. He is sued in his individual capacity. At all times relevant to this complaint, he acted under color of law. In his individual capacity, he caused or failed to intervene against the discriminatory actions, policies, practices, customs and deprivations described in this Complaint.

10. Defendant Amy Levek is the Principal of Whitefish Bay High School Principal and is sued in her individual capacity. At all times relevant to this complaint, she acted under color of law. In her individual capacity, she caused or failed to intervene against the discriminatory policies, practices, customs and deprivations described in this Complaint.

11. Defendant Julie Henningsen was Assistant Principal of Whitefish Bay High School Principal until she left that position at or around the end of the 2023-24 school year. She is sued in her individual capacity. At all times relevant to this complaint, she acted under color of law. In her individual capacity, she caused or

4

failed to intervene against the discriminatory policies, practices, customs and deprivations described in this Complaint.

### III. ALLEGATIONS OF FACT AS TO ALL CLAIMS

12. K.K. and his family moved into Whitefish Bay when K.K. was in elementary school.

13. K.K.'s mother, Ms. White, is a highly respected banker with a leadership role in her company, an active community member, and a deeply involved and caring parent.

14. Ms. White moved her family into Whitefish Bay specifically so that K.K. and his sibling could attend Whitefish Bay's highly regarded schools.

15. K.K. is a talented athlete and has a deep desire to do well in school and sports.

16. K.K.'s dream is to go to college and play football at the collegiate level.

17. According to data published by the Wisconsin Department of Public Instruction (DPI), Black students make up only about 3% of the student population in Whitefish Bay schools.

18. Black residents make up about 2.7% of the overall Whitefish Bay population.

19. Geographically, most of Whitefish Bay consists of single-family homes.

20. One neighborhood in the southwest corner of Whitefish Bay—bordered by Santa Monica Avenue to the East, Fairmount Avenue to the North, Lydell

Avenue to the West, and Hampton Avenue to the South—consists of apartment and townhome complexes.

21.     A significantly higher proportion of Black residents live in this neighborhood than in other neighborhoods in Whitefish Bay.

22.     Ms. White, K.K., and their family live in this neighborhood, in a townhome on Shoreland Avenue.

23.     Ms. White's sister lives in the same neighborhood, with her daughter, K.D., who is K.K.'s cousin.

24.     The 2023-24 school year was K.K.'s freshman year at Whitefish Bay High School.

25.     K.K. was a member of the Freshman football team.

*M.S.'s Harassment of K.K.*

26.     During the summer of 2023, K.K. dated M.S., a female student of the District.

27.     In the summer of 2023, M.S. was going into eighth grade at Whitefish Bay Middle School.

28.     Around the start of K.K.'s freshman year, K.K. broke up with M.S.

29.     After breaking up with M.S., K.K. asked a different female student, M.R., to the homecoming dance at Whitefish Bay High School.

30.     M.S. was angry about the breakup.

31.      On the evening of Monday, September 4, 2023, M.S. and another Whitefish Bay Middle School student sent harassing text messages to K.K. and M.R.

32.     The messages discussed K.K.'s relationship history with M.S. and made references to kissing and sexual activity in a manner clearly intended to cause emotional distress and discomfort to K.K. and M.R.

33.     Ms. White notified District staff, who sent screen shots of the text messages to Middle School Principal Mike O'Connor.

34.     Principal O'Connor did not take any action in response to receiving the screen shots of the text messages.

35.     M.S. continued sending threatening messages to K.K., including a threat to publish explicit video of K.K. and a threat to ruin K.K.'s football season.

36.     M.S.'s threatening and harassing texts caused to K.K. to feel anxious and distracted at school, such that he struggled to focus on his learning.

37.     On Wednesday, September 6, Ms. White emailed Principal O'Connor about the escalating situation. She wrote:

> The situation has now spilled over to impacting K.K. during the school day, as [the middle school students] are sharing they intend to ruin his football season, threatening to send apparent videos (in which K.K. is not a part of any) and more.

> It's bothering K.K. so much that he is contacting me during the school day with frustrations of it. As we know, per the district's bullying and harassment policy, behaviors should not impact the student's ability to learn. This is happening. In addition, K.K. has an IEP to aid in his ability to learn effectively.

38.     Under the then-current School Board bullying policies,[1] school and district level administrators were authorized to take disciplinary action against bullying and harassment that happened off school property based on "whether the

---

[1] Attached and incorporated by reference, Ex. A, at *3.

7

conduct is determined to be so severely disruptive of the educational process that it markedly impedes the day to day interaction of the school."

39.    Principal O'Connor did not take any action. Instead, he told Ms. White that since the initial text messages had been sent at night and "did not have a direct correlation to school, it seemed like a matter best handled between parents or, if the level of concern was high, with the WFB police department."

40.    Ms. White emailed Principal O'Connor again, reiterating that the M.S. had threatened to impact K.K. in his sports, and that her threats were affecting his ability to learn at school.

41.    She also expressed concern that there might be an issue at a game where K.K. is a student athlete. Principal O'Connor replied that "there are limits to the issues that the school can be involved with given our polices" and again suggested that Ms. White reach out directly to the parents of the middle school students.

42.    On or around Thursday, September 7, K.K. went to speak with high school assistant principal Julie Henningsen.

43.    K.K. told Henningsen that M.S. was threatening him, that it was affecting his ability to learn at school, and that he was concerned that M.S would cause a disruption during football.

44.    Ms. Henningsen told K.K. that because the texts had been sent after school hours, the District would not do anything.

45.     Realizing that the District was not going to offer any help, Ms. White sent text messages to M.S. asking her to stop harassing K.K. and M.R.

46.     Ms. White also asked to speak with M.S.'s mother, but M.S. ignored Ms. White's request.

47.     On the evening of September 8th, the Whitefish Bay varsity football team played a home game at Whitefish Bay High School.

48.     Ms. White. K.K., and M.R. all attended the game.

49.     During the game, M.S. began following K.K. and M.R. around the stadium, making threatening gestures that indicated she intended to fight M.R.

50.     K.K. called Ms. White and asked for support.

51.     In response to K.K.'s call, Ms. White walked with M.R. to the stadium exit so that M.R. could safely leave the game.

52.     Ms. White then texted M.S. and asked to speak with her mother.

53.     M.S.'s mother and other family members approached Ms. White in an aggressive, threatening manner.

54.     M.S.'s mother told Ms. White that she had a gun.

55.     Ms. White asked nearby police officers to help defuse the situation.

56.     Ms. White told police that M.S.'s mother had referenced a gun.

57.     Following this incident, Assistant Principal Henningsen interviewed Ms. White, M.S.'s mother, and M.R.'s mother.

58.     Ms. White reiterated the following facts to Ms. Henningsen: (1) that M.S. had sent threatening messages to K.K. and M.R. in the preceding days; (2)

that district officials had told Ms. White to address the issue directly with M.S.'s parents; (3) that Ms. White had attempted to communicate directly with M.S. and her mother about the harassment but had not succeeded in resolving the issue; (4) that M.S. had followed M. at the game and made threatening gestures; (5) that Ms. White had attempted to speak with M.S.'s mother at the game to resolve the issue; and (6) that M.S.'s mother had made a threat involving a gun.

59.    M.R.'s mother also corroborated to Assistant Principal Henningsen that M.S. had sent threatening messages to K.K. and M.R. in the days before the game.

60.    Assistant Principal Henningsen did not take any action to discipline M.S. or to protect K.K. from further threats or harassment from M.S.

61.    Instead, with complete disregard both for Ms. White and K.K.'s many efforts to obtain the District's assistance in stopping M.S.'s misconduct from escalating in the school setting and for District personnel's explicit instruction to Ms. White to address the issue directly with M.S.'s parent, Assistant Principal Henningsen indicated to Ms. White that she believed Ms. White had behaved inappropriately by attempting to speak with M.S.'s mother at the game.

62.    Assistant Principal Henningsen also emailed Ms. White screenshots of text messages between M.S. and K.K. that she had obtained from M.S.'s parent.

63.    In the text messages, K.K. begged M.S. to stop bothering him and M.R. and expressed fear that M.S.'s threats and hurtful conduct towards K.K.'s friends would ruin his high school career.

64.     However, Assistant Principal Henningsen presented the text messages to Ms. White in a manner suggesting Henningsen believed they reflected culpability or misconduct by K.K.

65.     M.S. continued to harass K.K.

66.     Her harassment of K.K. included posting an intimate video of him on social media and going on to high school grounds for no reason but to conspicuously watch him.

67.     On November 3, Ms. White filed a harassment complaint against M.S. using the District's online harassment complaint form pursuant to School Board anti-harassment policy.[2]

68.     The School Board harassment investigation procedures provided that (1) the Title IX Coordinator was to provide a written acknowledgment to the complainant upon receiving a written harassment complaint,[3] and that an administrator was to conduct an initial screening and, if the complaint was determined not to involve conduct that violated the District's anti-harassment rules, notify the complainant of the determination.[4]

69.     Ms. White did not receive any written acknowledgement or notice of a screening decision regarding the harassment complaint she had filed against M.S.

*Homecoming Parade Altercation*

---

[2] *Id.* at *5.
[3] *Id.* at *14.
[4] *Id.*

70.  On September 29, 2023, Whitefish By High School held a homecoming parade.

71.  K.K. walked in the parade as a member of the Freshman football team.

72.  On the day of the parade, K.K. had an ankle injury, which caused him to limp.

73.  K.K. fell behind the other members of the football team.

74.  Two brothers, R.L. and C.L., were walking behind K.K. as part of the rock-climbing team.

75.  R.L. was a senior and C.L. was a freshman.

76.  R.L. and C.L. were white.

77.  R.L. was larger and stronger than K.K.

78.  R.L. and C.L. were surrounded by their friends from the rock climbing team, whereas K.K. had fallen behind his friend from the football team and did not have any friends with him.

79.  At the time, C.L. harbored some resentment toward K.K. because C.L. had been turned down for the homecoming dance by a female student who was planning to instead attend the dance with a group that included K.K.

80.  R.L. and C.L began making fun of K.K.'s limp by laughing at him and mimicking how he was walking.

81.  K.K. reacted angrily, and R.L. escalated the altercation by continuing to insult K.K.'s shoes and hair.

82.  R.L. said K.K.'s hair looked like an "unpicked carrot."

83.     At the time, K.K. was wearing his hair in an afro style with the ends bleached.

84.     R.L. later told police that he insulted K.K. with the intent to "humiliate him a little bit."

85.     Eventually C.L joined in, also insulting K.K.

86.     K.K. insulted C.L. in return.

87.     R.L. then shoved K.K. causing him to stumble back.

88.     K.K. decided to walk away from the altercation.

89.     K.K. said to R.L. and C.L., "I'll have my mom handle you."

90.     When K.K. said "I'll have my mom handle you," he meant that he would have his mom address R.L.'s misconduct either by notifying the school administration or by addressing the issue directly with R.L.'s parents.

91.     R.L. said "That's a lame comeback."

92.     K.K. walked away from R.L. and C.L. and finished the parade.

93.     At no point in the altercation did K.K. commit any physical aggression against R.L. or C.L.

94.     The altercation described in ¶¶ 80-92 happened at approximately 3:30 in the afternoon, at the end of the school day.

95.     After leaving school, K.K. sent a series of Snapchat messages to C.L. saying that if R.L. wanted to fight, K.K. would meet him and they could fight.

96.     K.K. sent the Snapchat messages from his personal device, outside of school hours and off school property.

97. Shortly after sending the message described in ¶95, K.K. sent another message to C.L. saying that he did not want to fight and suggesting that he and C.L. agree to leave each other alone.

98. At approximately 5:20 p.m, nearly two hour after the altercation, R.L. approached High School Principal Amy Levek in her office at the high school.

99. R.L. told Principal Levek that K.K. had initiated an altercation during the homecoming parade.

100. R.L.'s allegation described in ¶ 99 was false, as it was R.L. and C.L., and not K.K., who initated the altercation.

101. R.L. told Principal Levek that, at the end of the altercation, K.K. had made a threat to have his mom shoot R.L.

102. R.L.'s allegation described in ¶101 was false, as K.K. only said "I'll have my mom handle you," and made no reference to shooting.

103. R.L. did not tell Principal Levek that he had shoved K.K.

104. R.L. did not tell Principal Levek that he had insulted K.K. with intent to humiliate him.

105. R.L. falsely told Principal Levek that K.K. had a history of bullying C.L.

106. Upon information and belief, the District had no prior record of any complaint of K.K. bullying C.L.

107. In fact, K.K. had considered C.L. a friend until the tension over C.L.'s failed homecoming invitation caused tension in their friendship.

108.    Upon information and belief, Principal Levek then spoke with C.L. and asked him to corroborate R.L.'s false allegations, and C.L. purported to corroborate R.L.'s allegation.

109.    At approximately 5:30 p.m., Principal Levek called the Whitefish Bay police.

110.    Levek did not attempt to speak with K.K. or his mother before calling the police.

111.    At around 5:45 pm the evening of September 29, Whitefish Bay Police Sergeant Daniel Rossman met with Ms. Levek in her office at the high school.

112.    Levek repeated R.L.'s false allegations that K.K. had initiated an altercation and made a shooting threat to Sergeant Rossman.

113.    Levek stated to Rossman,

> The reason I think this is super relevant is that at our last football game, K.K.'s mom was there and did kind of get into it with this other mom, they went back and forth, the police were there and there was mention of a gun in that space too. So this is not a new family that we've dealt with. Certainly there have been altercations with them before.

114.    Levek was referring to the incident described in ¶¶ 48-56, *supra,* in which M.S.'s mother made a gun threat to Ms. White.

115.    Levek did not tell Rossman that it was a different parent, and not  Ms. White, who made the gun threat.

116.    Levek did not tell Rossman that M.S. had sent harassing and threatening texts to K.K. in the days before the September 8 game.

15

117.   Levek did not tell Rossman that, before the September 8 game, Ms. White and K.K. had told district officials that they were concerned about M.S.'s threats and the District had declined to help.

118.   Levek's statement conveyed a false implication that Ms. Whtie was responsible for making the threat.

119.   Levek's statement conveyed to Ms. White that she viewed Ms. White and K.K.'s family as a problem.

120.   There was no factual basis to consider their family a problem; in fact Ms. White has worked hard to address problems proactively and amicably and to be a positive parent leader in the District.

121.   Levek's negative portrayal of Ms. White and K.K.'s family was based on her biased and stereotyping view that Black families are problematic and her biased mental tendency to assign culpability to Black people based on the actions of others of their race.

122.   Levek considered K.K. and Ms. White's family a problem based not on their own actions but on the actions of a different Black family, M.R.'s family.

123.   Levek assumed that R.L. and C.L.'s allegations against K.K. were true based on these prejudiced views.

124.   Levek and Rossman also engaged in the following conversation about K.K. and Ms. White:

> **Rossman**: Do they live in Whitefish Bay?
> **Levek**: They do. They live at [address redacted] N Shoreland.
> **Rossman**: Oh yeah, Shoreland. That's right. Alright.
> **Levek**: And his mom is Shaneeka White.

**Rossman**: Ah yes, I know who that is.
**Levek**: Yeah. I mean, all these families, there's a couple families that
just continually…
**Rossman**: There's another group down there, they're like two girls…
**Levek**: Yes. That's his cousins. So [K.D.] is K.K.'s cousin. And she's
always into it with [Student Z][5].
**Rossman**: Yes, yes.
**Levek**: Yes
**Rossman**: This all comes together.
**Levek**: We're as tired of it as you guys are.

125.    These statements show that Levek and Rossman made an prejudiced

assumption that K.K. and Ms. White were problematic because of the actions of

K.K.'s cousin and neighbor, K.D.

126.    Levek and Rossman made prejudiced assumption that K.K. and Ms.

White were problematic because they live in a neighborhood with a higher

proportion of Black people than in the rest of Whitefish Bay.

127.    Levek assumed that R.L. and C.L.'s allegations against K.K. were true

because of her prejudiced views about K.K.'s neighborhood and family.

128.    In Levek's evaluation of the credibility of R.L. and C.L.'s allegations

against K.K., K.K.'s neighborhood and family operated as proxies for his race.

129.     Levek instructed Rossman to find K.K. and tell him he was not

permitted at the football game that evening or the homecoming dance the next day.

130.    Levek did not instruct Rossman to gather any information from K.K.

or ask for his side of the story.

131.    Instead, Levek instructed Rossman to tell K.K. the high school

administration would "deal with him" on Monday morning.

_____

132. Later that evening, Levek discussed the matter with Assistant Principal Henningsen and Superintendent John Thomsen, who both assented to Levek's decision to exclude K.K. from the homecoming dance and the game.

133. That night, the Defendant Administrators did not make any plan to meet with K.K. and get his side of the story any sooner than Monday morning.

134. At 6:00 p.m, Whitefish Bay police knocked on Ms. White and K.K.'s door and informed the family that K.K. was not allowed to attend the homecoming game or dance because he had allegedly made a threat.

135. Ms. White went to the high school to try and speak with someone who could explain the allegations to her, but no one would speak to her.

136. Ms. White then called Superintendent Thomsen and left a message asking him to speak with her.

137. Ms. White then took K.K. to the police station so that he could give his side of the story to police.

138. K.K. told police that R.L. had initiated the altercation, that R.L. had shoved K.K., and that K.K.'s statement had been "I'll have my mom take care of you," not "I'll have my mom shoot you."

139. Ms. White told police that she believed R.L.'s conduct toward K.K. constituted harassment and bulling.

140. Ms. White told police that she felt Levek had violated K.K.'s due process rights by making the decision to exclude K.K. from homecoming based only

on other students' allegations, without giving K.K. a chance to tell his side of the story.

141.  Ms. White told police she believed Levek's actions were racially discriminatory.

142.  Ms. White told police that she intended to protest Levek's actions by staging a peaceful demonstration across the street from the homecoming dance.

143.  After meeting with Ms. White, Sergeant Rossman reported to Levek and Thomsen that K.K. denied making any statement about a gun or having his mother shoot anyone.

144.  Levek stated she still was going to exclude K.K. from homecoming.

145.  In the same call, Sergeant Rossman also reported to Levek and Thomsen that Ms. White intended to hold a demonstration protesting their handling of the allegations against K.K..

146.  In response, Levek and Thomsen directed Sergeant Rossman to tell Ms. White that if she set foot on school property she would be arrested.

147.  Levek told Officer Rossman she would review school video camera footage of the incident.

148.  Levek did review footage that night, but there was no footage of the altercation between R.L., C.L., and K.K.

149.  Even though she had enough time to review video camera footage that night, and even though Levek knew that K.K. disputed R.L. and C.L.'s allegations, Levek did not attempt to contact or call K.K. to get his side of the story.

150. At 8 pm, Sergeant Rossman called Ms. White and told her she would be arrested if she set foot on school property.

151. Being threatened with arrest by her son's school administrators was devastating and traumatizing for Ms. White.

152. Seeing his mother be threatened with arrest by his school administrators was devastating and traumatizing for K.K.

153. Ms. White did not know that Thomsen was involved in the decision to threaten her with arrest, and believed at the time that only Levek had issued the threat.

154. At 8:51 pm, Ms. White emailed Superintendent Thomsen, saying that Ms. Levek had excluded K.K. from homecoming activities and threatened her with arrest without even having a conversation with them.

155. On the following morning, September 30, sometime before 10:19 am, Thomsen called Levek and told her that she had to meet with K.K. to afford him due process.

156. If Thomsen had not told Levek she had to meet with K.K., she would not have met with him until Monday morning.

157. Levek texted Henningsen and told her they had to speak with K.K. to provide him due process, and Henningsen replied, "I'm so pissed."

158. Thomsen then emailed Ms. White and told her he had instructed Levek to meet with her.

159. Ms. White asked if Thomsen was available to meet with her and he replied, "I am unavailable today. This is a building level/principal issue right now."

160. At 10:30 a.m on Saturday, September 30, Levek interviewed another student whom R.L. had identified as a witness.

161. On information and belief, Levek interviewed R.L.'s friend, O. (Last name unknown.)

162. Levek had time to meet with O., a witness sympathetic to R.L. and C.L., on Saturday morning, but would not have met with K.K. until Monday morning absent Thomsen's instruction.

163. At 10:42 a.m. on Saturday, September 30, Levek emailed Ms. White and indicated that she and Ms. Henningsen speak with K.K. and get his side of the story.

164. At 11:17 a.m. on Saturday, September 30, Levek and Henningsen spoke with K.K. and Ms. White by phone.

165. This was the first opportunity K.K. had to tell anyone from the District his side of the story.

166. K.K. told Levek and Henningsen that R.L. and C.L. had initiated the altercation, that R.L. had pushed him, and that he had said "I'll have my mom take care of you," not "I'll have my mom shoot you.

167. Ms. White asked Ms. Levek and Ms. Henningsen how many students had made statements alleging that K.K. had made a threat.

168.    Ms. Levek and Ms. Henningsen refused to tell Ms. White and K.K. how many students had made statements.

169.    At that time, Ms. White and K.K. did not know R.L.'s name. They only knew that he was C.L.'s older brother.

170.    Ms. White asked Levek and Henningsen for the name of the student who had made the false accusations against K.K. and they refused to provide it.

171.    Ms. White told Levek and Henningsen that she wanted to file a bullying complaint against the students who had initiated the altercation with K.K., based on the students insulting and pushing K.K.

172.    Levek and Henningsen told Ms. White she could fill out the bullying complaint report without knowing the student's name since Levek and Henningsen knew who the student was.

173.    Levek and Henningsen told Ms. White they would investigate further to determine if R.L. pushed K.K.

174.    Ms. White filed a bullying complaint against R.L. using the District's online bullying complaint form.

175.    The School Board harassment investigation procedures provided that (1) the Title IX Coordinator was to provide a written acknowledgment to the complainant upon receiving a written harassment complaint,[6] and (2) that an administrator was to conduct an initial screening and, if the complaint was

_____

[6] *Id.* at *14.

determined not to involve conduct that violated the District's anti-harassment rules, notify the complainant of the determination.[7]

176.    Ms. White did not receive any written acknowledgement or notice of a screening decision regarding the harassment complaint she had filed against R.L. and K.K. for more than two months.

177.    After hearing K.K.'s side of the story, Levek and Henningsen did not circle back to R.L., C.L., or O. to evaluate how they responded to K.K.'s version of events.

178.    Upon information and belief, C.L., and O. were the only witnesses that corroborated R.L.'s allegations against K.K.

179.    At 1:49 pm on September 30, Levek emailed Ms. White to confirm that she would not allow K.K. to attend the homecoming dance that evening.

180.    In her email, Levek stated, "we will evaluate potential school based consequences on Monday morning. K.K. may come to the office while we make that determination or you may keep him at home and we will contact you."

181.    Ms. White responded to Levek's email to ask if they had been able to confirm whether R.L. pushed K.K., but Levek and Henningsen did not respond.

182.    At 7:15 pm on September 30, Ms. White spoke with Sergeant Rossman, who told her R.L. had admitted to police that he had pushed K.K.

183.    Upon information and belief, R.L. and C.L. were allowed to attend the game, and C.L. was allowed to attend the dance, despite their role in bullying K.K.

---

[7] *Id.*

184. On Monday, October 2, Henningsen again called Ms. White.

185. Henningsen said the District had completed its investigation and would be imposing a 3 day suspension on K.K., which would also result in K.K. receiving an athletic suspension and missing a football game.

186. Ms. White asked for details of the investigation, including the number of witnesses the district had spoken to, who the witnesses were and how they had been identified, or when the district had spoken to them, but Ms. Henningsen refused to provide any such information.

187. Henningsen told Ms. White that she had reviewed video evidence of the incident, but refused to describe what the video showed.

188. In fact, Levek had told the police that she had reviewed video evidence of the incident but that the video did not show the altercation.

189. Ms. White told Henningsen it was unfair to issue a suspension based only on witness statements without giving K.K. an opportunity to know even basic information about who the witnesses were and what they had said.

190. Henningsen replied that, even if K.K. didn't make the alleged threat, she and Levek could still suspend him based on the texts he had sent to C.L. saying he was willing to meet R.L. and fight.

191. Ms. White asked why K.K could be suspended based on texts he sent on his personal device while off school property and outside of school hours, but the district would not discipline M.S. for threatening and harassing texts she sent to K.K. while off school property and outside of school hours.

24

192.    Henningsen grew angry and abruptly ended the call.

193.    Henningsen entered a three-day suspension in K.K.'s discipline report with a note that read "[K.K] verbally threatened another student during the WFBHS homecoming parade adjacent to school grounds. Multiple students in his vicinity reported that he stated "I'm going to get my mom to shoot you" during an argument with another student."

194.    On the afternoon of Monday, October 2, Levek pulled two of K.K.'s football teammates into her office and asked them if they had witnessed the incident during the parade.

195.    Levek's demeanor toward K.K.'s teammates was cold and intimidating.

196.    Levek's demeanor gave K.K.'s teammates the impression that if they tried to stand up for K.K., Levek would accuse them of lying.

197.    K.K.'s teammates told Levek that they had not witnessed the incident during the parade.

198.    One of K.K's teammates then texted K.K. that he had met with Levek but felt that if he tried to stand up for K.K. Levek would accuse him of lying.

*Discrimination Complaint and Appeals Process*

199.    On October 3, Ms. White filed a letter with District Director of Pupil Services Tim Lemke which comprised (1) a complaint of racial discrimination against Levek and Henningsen; (2) an appeal of K.K.'s suspension; and (3) a complaint that R.L. and C.L. had bullied and harassed K.K. during the parade.

200.    K.K. returned to school on Oct. 5.

25

201.  That morning, the district held a re-entry meeting with K.K., Ms. White, K.K.'s stepfather, K.K's counsel, Mr. Lemke, Ms. Levek, and District counsel Chrissy Hamiel all present.

202.  During the re-entry meeting, Levek and Lemke instructed K.K. not to talk about the incident or his suspension with other students.

203.  K.K.'s attorney pointed out that such a restriction would violate K.K.'s First Amendment rights, and Levek and Lemke backed away from the directive.

204.  Ms. White filed an open records request with the Whitefish Bay Police Department seeking records of the Police investigation into the R.L.'s allegations against K.K.

205.  The Police Department produced several body cam videos showing police interviews with R.L., and C.L. that had happened on the evening of the 29th, and another interview with and R.L.'s friend, O. (last name unknown), which occored on the morning of the 30th..

206.  The videos revealed inconsistencies in R.L', C.L., and O,'s versions of events that call their credibility into question. These inconsistencies include:

> a.  Both C.L. and R.L. alleged in their interviews that K.K. instigated the altercation by making a comment to one of them. However, C.L. alleged that K.K. made a comment to R.L., while R.L. alleged that K.K. made a comment to C.L.. Neither C.L. nor R.L. could remember what specifically K.K. said to purportedly start the confrontation. For his

part, O. claimed to have witnessed the altercation but stated he he "did not know" how the altercation started.

b. R.L., C.L., and O. also gave conflicting versions of the alleged shooting comment which calls their credibility into question. C.L. stated that K.K. was about to fight, but then made the shooting comment which prompted R.L. and C.L. to walk away. In contrast, R.L. stated that K.K. was already walking away as he made the comment. O. stated that K.K. made the comment and then continued to engage with C.L. and R.L and made additional comments to them.

207. The recordings also show R.L. admitting to police that he pushed K.K., that he was bigger and stronger than K.K., and that he verbally insulted K.K. with the goal of humiliating him, all of which corroborates Ms. White's claim that R.L. and C.L. harassed and bullied K.K. during the homecoming parade.

208. If Ms. White and K.K. had had the opportunity to confront R.L., C.L., and O. or review their statements before Levek and Henningsen issued the suspension, they could have challenged the credibility of their allegations and prevented the district from entering a damaging falsehood in K.K.'s discipline record.

209. The police records also included body cam footage of the conversation between Levek and Sergeant Rossman described in ¶¶ 104-113, in which Ms. Levek falsely implied that Ms. White had previously made a gun threat and expressed animus against K.K. and Ms. White based on their neighborhood and family.

27

210.    On October 13, 2023, Ms. White's counsel emailed District counsel and indicated that Ms. White had obtained additional evidence that she wished to submit in support of the discrimination complaint and suspension appeal she had filed on October 3.

211.    On October 18, Ms. White's counsel provided the police videos to District counsel by uploading the videos to a shared Google folder.

212.    On October 23, Ms. White and K.K.'s counsel sent a letter to Defendants explaining how the police video revealed credibility issues with R.L., C.L., and O's allegations.

213.    Ms. White further agreed to extend the deadline for Mr. Lemke to render a decision on the discrimination complaint and suspension appeal by several days to allow Mr. Lemke time to review the additional video evidence.

214.    On November 13, Lemke issued a Decision[8] upholding K.K.'s suspension and finding that Levek and Henningsen had not discriminated against K.K. on the basis of race.

215.    Lemke did not include the police body cam evidence Ms. White had provided in the list of evidence he considered in rendering his decision.

216.    Further, Lemke determined that Levek and Henningsen had not discriminated against K.K. based only on a *McDonnell-Douglas* discrimination analysis. He did not consider any other applicable ways of establishing a discrimination claim.

---

[8] Attached and incorporated by reference, Ex. B.

28

217.   Ms. White had also attached to her complaint statements from two former Whitefish Bay students of color describing incidents where Ms. Levek had disciplined them based on allegations by white students without giving them a fair opportunity to contest the allegations, and Mr. Lemke did not consider those statements in rendering his decision.

218.   Ms. White appealed Mr. Lemke's decision.

219.   Under the district nondiscrimination policy[9] then in effect, an appeal of a discrimination complaint determination was to be directed to Superintendent Thomsen, unless the complaint involved alleged improper behavior by Thomsen.

220.   Mr. Lemke's written decision indicated that Thomsen had played an active role in some of the actions that gave rise to the complaint, including the decision to exclude K.K. from homecoming activities and the decision to threaten S.W. with arrest after she told the officer of her intent to protest.

221.   Ms. White therefore requested pursuant to District policy that the School Board and not Thomsen hear her appeal.

222.   The School Board declined Ms. White's request and instructed her to present her appeal to Mr. Thomsen.

223.   On December 11, 2023, Ms. White's counsel sent Dr. Thomsen an email with a link to a Google folder containing evidence supportive of the allegations in the Complaint, as well as several U.S. Department of Education Office for Civil

---

[9] Attached and incorporated by reference, Ex. C.

29

Rights cases discussing the kinds of evidence that can be used to prove racial discrimination in the school context.

224.     Ms. White and counsel then met with Dr. Thomsen and discussed at length the legal guidance and evidence included in the folder.

225.     During the December 11 meeting, Ms. White indicated to Dr. Thomsen that she had not received any response to the harassment complaint form she had submitted on September 30 regarding R.L. and C.L.'s conduct during the homecoming parade, or the sexual harassment complaint she had filed against M.S. on or around November 2.

226.     At the end of the meeting, Thomsen stated that he had "tremendous faith in [his] team members," meaning Levek and Henningsen, despite the fact that Ms. White and her counsel had just provided him extensive evidence of Levek and Henningsen's biased and unprofessional conduct and failures to follow policy.

227.     Two days later, on Dec. 13, Assistant Principal Henningsen emailed Ms. White an administrative determination [10]summarily dismissing the two harassment complaints.

228.     Ms. Henningsen's determinations of the harassment complaints were untimely under state law and district policy.

229.     Henningsen dismissed the complaint against R.L. and C.L. on grounds that the altercation constituted  "conflict" and not bullying, despite ample evidence, including R.L.'s own admissions, that R.L. insulted and physically aggressed

---

[10] Attached and incorporated by reference, Ex.

against K.K. in a manner intended to intimidate and degrade him and in a context where there was a significant imbalance of power between R.L. and C.L., consistent with the School Board policy's definition of bullying.[11]

230.    Henningsen dismissed the sexual harassment complaint against M.S. on grounds that the complaint alleged a single time that M.S. was on high school grounds to bother K.K. and the behavior was not "chronic," completely ignoring the many other times known to her that M.S.' harassment affected K.K. on school grounds including when she followed K.K. and M.R. making threatening gestures at the football game and when she sent messages to M.R. that disrupted K.K.'s ability to maintain his friendship with M.R. at school, and when she sent text messaeges to K.K. and posted video of K.K. that caused him such distress he could not focus in class and on at least one occasion needed to be picked up and brought home from school.

231.    On December 15, Dr. Thomsen issued a Determination[12] as to Ms. White's appeal from Mr. Lemke's determination of the discrimination complaint and suspension appeal Ms. White had filed on October 3.

232.    Dr. Thomsen's Determination explicitly declined to consider the evidence Ms. White had presented at the December 11 meeting with respect to the racially discriminatory nature of Ms. Levek and Ms. Henningsen's conduct

---

[11] Ex. A at *7.
[12] Attached and incorporated, Ex. E.

233. On December 21, 2023, Ms. White appealed Ms. Henningsen's administrative determination regarding the two harassment complaints to Dr. Thomsen.

234. On January 4, 2024, Dr. Thomsen met with Ms. White and K.K. regarding their appeal of Henningsen's determination two harassment complaints.

235. During the Jan 4 meeting, Dr. Thomsen spoke with K.K. about messages K.K. had exchanged with M.S. in September.

236. As Dr. Thomsen acknowledged, K.K.'s participation involved asking M.S. to stop bothering him and M.R.

237. Dr. Thomsen exact words during the meeting were: "In those exchanges I notice you saying, 'stop this," right, "I don't want to be part of this."

238. Dr. Thomsen also told K.K. he "admir[ed]" how K.K. told M.S. to leave him alone, and told K.K. that he was "not sure that behavior from M.S.] is going to change."

239. However, January 12, 2024, Dr. Thomsen issued a decision[13] upholding Henningsen's dismissal of the two harassment complaints.

240. Completely inverting his acknowledgement during the meeting that K.K.'s role in the text exchanges was to ask M.S. to stop her misconduct, Dr. Thomsen's Jan 12 decision portrays K.K. and M.S. as equally culpable participants in "angry, bitter, and profane exchanges" and includes no acknowledgment that

---

[13] Attached and incorporated, Ex. F.

K.K.'s role in the exchanges was to repeatedly ask M.S. to stop bothering him and move on.

241. On January 19, Ms. White appealed the determinations of the discrimination complaint, the suspension appeal, and the two harassment appeals to the school board.

242. The School Board, by counsel, sent Ms. White a letter[14] indicating that it would hear Ms. White's appeals in a series of two closed-session meetings.

243. The Board's letter stated that, during the closed meetings, it would require "that any students other than K.K. be referenced simply as 'Student A, Student B, Student C, etc.'" and that administrators "be referenced simply as 'Administrator A, Administrator B, Administrator C, etc.'"

244. The Board's letter also prohibited Ms. White from recording the meetings.

245. Ms. White and K.K's counsel objected to the requirement that administrators be referred to by letters instead of by name during the meeting on grounds that it imposed an unnecessary and burdensome limitation on Ms. White and K.K.'s ability to make their case to the Board.

246. The Board Counsel replied that Ms. White and K.K. had to agree to follow the rule or the school board would not hold the hearings.

247. Ms. White, K.K. and their counsel attended the two meetings with the board and presented arguments that (1) M.R. had harassed K.K. at school and

---

[14] Attached and incorporated, Ex. G.

caused distress that disrupted his school day such that the excuse that the Board could not address her conduct because it happened off campus was pretext; (2) R.L. and C.L.'s conduct constituted bullying under District harassment policy especially in light of R.L.'s admissions to police that he was older and larger than K.K. and insulted K.K. with the goal of humiliating him; (3) Levek's immediate assumption that R.L.s allegations against K.K. were true were based in improper generalizations about K.K.'s neighborhood and reflected racial prejudice; (4) the Arlington Heights factors supported a finding that Levek's actions towards K.K. were taken with racially discriminatory intent; and (5) Thomsen had administered a biased process with respect to both the Discrimination and the Harassment appeals which were designed to protect himself and the other administrators at the expense of K.K. and his rights.

248.    In addition, during the second of the two meetings, several community members came to speak in support of Ms. White and K.K. during the public comment period before the board went into closed session.

249.    The Board also applied the rule prohibiting discussion of administrators by name to the public comment period.

250.    The Board does not usually require members of the public who are speaking in public comment to refer to administrators by letters instead of name.

251.    The Board imposed this rule on public comment during these specific meetings because it knew that speakers were likely to criticize administrators for their handling of racial issues in the District.

34

252. Further, Board President Anne Kearney adopted an angry, demeaning, and dismissive tone to the supporters of S.W. and K.K. who spoke during public comment.

253. For example, Ms. White's mother attempted to speak about an incident where she attempted to meet with Ms. Levek about her granddaughter and Ms. Levek ignored her and then slammed the door in her face.

254. Ms. White's mother slipped and mentioned Ms. Levek by name instead of a letter, and Board President Kearney immediately screamed at her and cut her off.

255. Ms. Kearney made rude and dismissive comments to other speakers,

256. No news media were present for public comment.

257. No one was recording the comment period.

258. There were only approximately 15 people present.

259. There was no legitimate reason to prohibit those present from identifying administrators by name.

260. After public comment ended, the board went into closed session with Ms. White, K.K, and their counsel, and the rest of their supporters went outside the room where the meeting was held.

261. Midway through the meeting, Ms. Kearney heard the supporters laughing outside in the hallway.

262. Ms. Kearney abruptly stopped the meeting and rushed to the door where she screamed at the supporters.

263.    Some of the supporters were members of a community organization, Bay Bridge, which had been advocating for improved racial equity in the District for a period of years.

264.    Following the two meetings, the Board issued two decisions.

265.    The Harassment decision[15] upheld Thomsen's determination that R.L. and M.S. had not harassed K.K.

266.    The Discrimination decision[16] did not state an answer as to whether or not Levek and Henningsen had discriminated against K.K. by applying discipline inequitably to him and denying him due process, even though that was the gravamen of Ms. White's initial complaint.

267.    The Discrimination did not effectuate any change in K.K.'s legal status or remediate any harm caused to him.

268.    K.K. continues to suffer emotional distress, first triggered by Levek and Henningsen's unfair and prejudiced investigation of R.L. and C.L.'s allegations against him, and compounded by an appeal process in which leaders of his school district repeatedly demonstrated bias and a desire to protect administrators at the expense of his rights.

269.    K.K. experienced racial harassment at school throughout his freshman year, and his feeling that administrators do not care about his rights makes it hard for him to seek support. In September of his freshman year, a student called him the N word during football practice. K.K.'s coach told him and other Black students

---

[15] Attached, Ex H.
[16] Attached, Ex. I.

not to make it a big deal. In the winter, during wrestling season, the same student again called him the N word. In the spring, a different student told K.K. that if they lived in the past he would have owned K.K., a reference to slavery. Ms. Henningsen investigated that incident, but her report to Ms. White is focused not on supporting K.K. in dealing with an outrageous racial insult, but blaming him for conduct which she claims triggered the insult—making K.K. responsible, in other words, for another students act of cruel bigotry.

270.  K.K.'s distress is so significant that it affects his ability to focus on learning. Though he started his freshman year on a strong academic footing, his grades slipped over the year to the extent that he lost his athletic eligibility for the start of his sophomore year.

271.  He frequently asks his family to move out of the district or enroll him in a different school.

## COUNT I: PROCEDURAL DUE PROCESS VIOLATIONS (K.K. against All Defendants)(Fourteenth Amendment/§ 1983)

272.  Plaintiff reincorporates and realleges all previous paragraphs.

273.  K.K. has a property interest in a public education under Article X,§ III of the Wisconsin Constitution.

274.  Acting intentionally and under color of law, Defendants deprived K.K. of said property interest by suspending him from school, barring him from participating in homecoming activities, and suspending him from the football team.

275.    K.K. has liberty interests in his reputation; in participating in school events, activities, and sports; and in pursuing his goal of attending college and playing collegiate sports.

276.    Acting intentionally and under color of law, Defendants caused K.K. reputational harm by entering a suspension in K.K.'s disciplinary record together with a statement that reads "K.K. verbally threatened another student during the WFBHS Homecoming parade on Marlborough Ave. adjacent to school grounds. Multiple students in his vicinity reported that he stated 'I'm going to get my mom to shoot you' during an argument with another student."

277.    The suspension on K.K's disciplinary record caused a change in his legal status as it resulted in his exclusion from three days of school and a football game, and leaves a permanent mark on his high school disciplinary record.

278.    Being labeled as having made a threat involving shooting is deeply damaging to a young person's reputation.

279.    Many colleges and universities require applicants and athletic recruitment candidates to disclose their high school discipline records as part of the application process.

280.    Having a shooting threat falsely documented on his high school discipline record is likely to impede K.K. in his pursuit of college admission and an athletic scholarship.

281.    By entering the false statement on K.K.'s disciplinary record, Defendants caused him stigmatic harm that altered his legal status and rights.

282.   Defendants deprived K.K. of his property and liberty interests without providing a fair or adequate process.

283.   A student facing suspension from school has a clearly established right to "oral or written notice of the charges against him, and if he denies them, an explanation of the evidence the authorities have and an opportunity to tell his side of the story." *Goss v. Lopez,* 419 U.S. 565, 581 (1975).

284.   In some suspension cases involving disputes about facts and arguments about cause and effect, a student is entitled to additional process, which may include cross-examination and counsel, to ensure reasonable fact finding and prevent erroneous deprivation. *Id.* at 583-584 ("At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect. He may then determine himself to summon the accuser, permit cross examination, and allow the student to present his own witnesses. In more difficult cases he may permit counsel."); *id.* at 584 ("[I]n unusual situations, though involving only a short suspension, something more than the rudimentary procedures will be required.").

285.   Further, due process requires that the school official responsible for deciding whether to suspend a student from school be impartial. *Lamb v. Panhandle Cmty. Unit Sch. Dist. No 2,* 876 F. 2d 526, 530 (7th Cir. 1987).

286.   Due process requires a school to provide "fundamentally fair procedures" before suspending a student. *Goss,* 419 U.S. at 574.

287. Defendants suspended K.K. and memorialized a reputation-damaging falsehood in his discipline record without adequate process in violation of K.K.'s due process rights in that: (1) Levek and Henningsen repeatedly denied Ms. White and K.K.'s requests to know the number of witnesses and the names of witnesses who gave evidence against him; (2) Henningsen told Ms. White the decision to suspend K.K. was supported by video evidence but refused to explain what the video evidence showed; (3) Levek and Henningsen did not interview K.K. until after they had interviewed multiple hostile witnesses, and they did not re-interview K.K.'s accusers after their interview with K.K. revealed significant disputes about facts and cause and effect; (4) both Lemke and Thomsen declined to consider relevant, reliable evidence that Ms. White had provided without identifying a valid reason for excluding the evidence; and (5) the school board imposed an needless and irrational burden on K.K.'s ability to clearly present his case by forbidding him, Ms. White, and their counsel from referring to administrators and other students by name, even in a closed session hearing where recording was not permitted.

288. Further, defendants violated K.K.'s due process rights by acting to deprive him of liberty and property based on bias and self-interest.

289. Defendant Levek showed bias when she (1) made judgements about the credibility of allegations against K.K. based on negative generalizations about his neighborhood and family; (2) made judgments about the credibility of allegations against K.K. by misattributing M.S.'s mother's gun threat to K.K's mother; (3) gave

false information about K.K. and his mother to police; (4) threatened Ms. White

with arrest when she attempted to advocate for K.K.

290.     Defendant Thomsen showed bias when he (1) heard K.K.'s appeal

despite having been closely involved in the decisions that gave rise to K.K.'s

underlying discrimination claim; and (2) ended the December 11 meeting with Ms.

White by saying he had "tremendous faith in [his] team members," i.e. Levek and

Henningsen, despite Ms. White having just presented extensive evidence of their

misconduct, suggesting that a decision in favor of his team members was

predetermined, and (3) he repeatedly misstated, distorted, or omitted facts and

statements favorable to K.K. and Ms. White in his written decisions so as to justify

the actions of the administrators at earlier stages of the process.

291.     Thomsens factual distortions and omissions include the following:

a.  Mr. Lemke's Nov. 15 written decision states that Levek and

    Henningsen interviewed three students who corroborated the

    allegations against K.K. and two who did not see or hear anything of

    concern. Thomsen changed that fact in his decision with no

    explanation, saying that all five witnesses gave corroborating

    statements to Levek. Thomsen's distortion makes Levek's disciplinary

    decisions about K.K. appear more justified than they are.

b.  Ms. White explained during the Dec. 11 meeting that during a

    conversation with a police officer on September 29, she had tried to

    make the point that Ms. Levek was taking significant adverse actions

41

against K.K. based only on allegations by saying, as a rhetorical example, "what if I said Ms. Levek had threatened to shoot me" and asking whether the police would take adverse action against Ms. Levek based only on that unsupported allegation. Dr. Thomsen's Discrimination Determination includes extensive discussion[28] of the police report's distorted representation of that interaction (distortions that play into a racist "angry black woman" stereotype and reflect clear bias on the part of the police officer) but does not include any acknowledgement or discussion of Ms. White's explanation of that event. Thomsen's distortion of Ms. White's statements makes Ms. Levek's hostile conduct towards Ms. White appeal more justified than it was.

c. During the Jan 4 meeting, Dr. Thomsen asked K.K. about the meaning of R.L.'s insult that K.K.'s hair looked like an "unpicked carrot." K.K. responded that he thought it related to him having to "pick his hair out."[29] Picking one's hair out is a technique for maintaining natural African hair. Dr. Thomsen harassment decision omits K.K.'s statement that R.L.'s statement related to K.K. picking out his hair. Thomsen's omission make's Henningsen's finding that R.L.'s conduct was not bullying or harassment appear more justified than it was.

d. During the Jan 4 meeting, Dr. Thomsen spoke with K.K. about messages K.K. had exchanged with M.S. As Dr. Thomsen

acknowledged, K.K.'s participation involved asking M.S. to stop bothering him and M.R. Dr. Thomsen exact words during the meeting were: "In those exchanges I notice you saying, 'stop this," right, "I don't want to be part of this." Dr. Thomsen also told K.K. he "admir[ed]" how K.K. told M.S. to leave him alone, and told K.K. that he was "not sure that behavior from M.S.] is going to change." The District has had access to K.K. and M.S. text exchanges since at least September and they do in fact show K.K. asking M.S. to stop bothering him and M.R.. However Dr. Thomsen's characterization of the communications between K.K. and M.S. in the Harassment Determination portrays them as equal participants in "angry, bitter, and profane exchanges" and includes no acknowledgment that K.K.'s role in the exchanges was to repeatedly ask M.S. to stop bothering him and move on. Thomsen's changed attitude toward those texts makes the decision not to support K.K. or discipline M.R. following the altercation at the September 8 football game appear more justified than it was.

e.  During the Jan 4 meeting, K.K. explained that M.S. had another girl, D., make jokes about him, calling him "stinky".[34] The Harassment Determination wrongly treats that other girl's insults as a separate incident and does not acknowledge that it was instigated by M.S..[35]

292.  The Defendants violation of K.K.'s due process rights caused K.K. harm including loss of education opportunity, reputational harm, and emotional

distress. Defendants biased attitude toward K.K. and their refusal to provide any information about the allegations against him have caused K.K. to lose trust in his school leaders. He feels they do not value or respect him, and fears that he will be disproportionately punished if he gets into any kind of trouble.

293. Defendants' actions proximately caused K.K. harm, for which he is entitled to compensatory damages, attorney fees, litigation costs, and all expenses associated with this action pursuant to 42 U.S.C. § 1983.

294. Further, in order to prevent future harm arising from the documentation of the suspension and shooting threat on K.K.'s high school record, K.K. is entitled to an injunction ordering the District to expunge the suspension and shooting threat from K.K.'s record.

295. The actions of Defendants Levek, Henningsen and Thomsen were malicious, intentional, or evinced reckless reckless disregard for K.K.'s rights and therefore justify an award of punitive damages.

## COUNT II: FINAL POLICYMAKER - RATIFICATION (K.K. against Board)(14th Amendment/§1983/Monell)

296. As alleged above, Levek and Henningsen violated K.K.'s due process rights by suspending him without adequately informing him of the evidence against him and by making the suspension decision based on bias.

297. Ms. White appealed Levek and Henningsen's suspension decision first to Lemke and then to Thomsen.

44

298. Lemke and Thomsen conducted a biased appeals process designed to protect Levek and Henningsen in which they without reason declined to consider relevant evidence that did not favor Levek and Henningsen.

299. Ms. White appealed to the school board, and presented extensive evidence that Ms. White and Levek had acted out of racial animus and that Lemke and Thomsen had run a biased process designed to protect them.

300. The school board knew that Lemke and Thomsen had conducted a biased process designed to protect the administrators at the expense of K.K.'s rights. Nevertheless the Board did not materially change the decisions based on this biased process, thus ratifying the administrators' misconduct

301. As a of the school board's action, the suspension remains on K.K.s record, and K.K. continues to experience emotional distress arising from the violation of his rights to fairness and equal treatment.

302. The School Board has final policymaking authority for the school district.

303. The School board's actions proximately caused K.K. harm, for which he is entitled to compensatory damages, attorney fees, litigation costs, and all expenses associated with this action pursuant to 42 U.S.C. § 1983.

## COUNT III: EQUAL PROTECTION VIOLATIONS (K.K. against Levek and Henningsen)(Fourteenth Amendment/§1983)

304. Plaintiff reincorporates and realleges all previous paragraphs.

45

305. K.K. has a clearly established right of equal access to all benefits and privileges of a public education.

306. In disciplining K.K., Levek and Henningsen treated him differently than similarly situated white students without a compelling state interest to justify the difference in treatment.

307. Levek and Henningseen treated K.K. differently in the discipline process by repeatedly ignoring his complaints that other students had threatened him, but taking harsh disciplinary action against him when white students complained that he had threatened them.

308. Defendants ignored K.K's complaints when:

   a. In the fall of 2023, M.S. sent text messages to K.K. threatening to release intimate video of him and disrupt his football season. Ms. White and K.K. reported the threats to district officials but they declined to get involved. M.S. then followed K.K. and his homecoming date around the school football stadium making threatening gestures at them. When K.K.'s mother attempted to intervene, M.S.'s mother escalated the interaction to a loud verbal altercation and made a threat involving a gun. Henningsen investigated but took no action, treating K.K. and Ms. White as if they somehow shared culpability for the threatening actions of M.S. and her mother. M.S. continued to harass K.K. for months following this incident, including posting an

46

intimate video of him and going onto high school grounds to watch him and make him uncomfortable

309. Defendants reacted very differently when white students R.L. and C.L. accused K.K. of making a threat against them. Defendants immediately acted to exclude and punish K.K. and involve police, without making any attempt to get K.K.'s side of the story. Defendants conducted an investigation focused on finding evidence to corroborate R.L.'s allegations, in contrast with the investigation of K.K.'s claims against M.S. which focused on making K.K. culpable for M.S.'s misconduct. Defendants treated texts that K.K. sent to C.L. outside of school hours and of school grounds as grounds for disciplinary action, whereas they told K.K. that they could not act on texts that M.S. sent him outside of school hours and off school grounds.

310. There is no reasonable non-discriminatory reason for Defendants different treatment of alleged threatening conduct reported by black students as compared to alleged threatening conduct reported by white students.

311. Defendant Levek made statements to police concurrent with her response to the white students accusation against K.K. indicating she was assessing the credibility of the allegations against K.K. and his mother based on biased generalizations about their neighborhood and family and the actions of other Black people.

312. Black students in Whitefish Bay are suspended from school at a rate nearly 14 times the rate at which white students are suspended.

313.    When Ms. White filed a complaint alleging that the District had shown inequity and bias in its response to the white students threat allegations against K.K., district personnel repeatedly departed from policy in handling the complaint, for example by repeatedly and unilaterally extending deadlines, excluding evidence without reason, misrepresenting and distorting evidence, and issuing a final written decision that did not answer the question whether discrimination happened.

314.    Levek and Henningsen's different treatment of Black student complainants and white student complainants was motivated by race.

315.    Defendants' actions proximately caused K.K. harm, including loss of educational opportunity and emotional distress, for which he is entitled to compensatory damages, attorney fees, litigation costs, and all expenses associated with this action pursuant to 42 U.S.C. § 1983.

316.    The actions of Defendants Levek, Henningsen and Thomsen were malicious, intentional, or reckless and therefore justify an award of punitive damages.

## COUNT IV: FINAL POLICYMAKER (K.K. against Board)(14th Amendment/§1983/Monell)

317.    Plaintiff reincorporates and realleges all previous paragraphs.

318.    Defendants Levek, Henningsen, and Thomsen violated K.K.'s Equal Protection and Due Process rights pursuant to a widespread custom within the Whitefish Bay school district of systematically ignoring Black students complaints

about misconduct by other students, but acting assertively on White students complaints about Black students.

319.    There is a widespread custom in the district of ignoring Black student's complaints about misconduct by other students, as evidenced by the following examples.

     a.   In On October 7, 2022, when K.K. was in eighth grade, a female student, N., sent text messages to K.K. telling him to go to a football game at the high school. N. brought another individual to the game who approached K.K. and struck him in the face. District staff at the game were notified of the assault, but did not notify the police. Ms. White emailed middle school principal Mike O'Connor that night to inform him of the incident and ask for support. Principal O'Connor told Ms. White to contact the police, but did not himself notify the police.

     b.   During the 2022-23 school year, when K.K. was in eighth grade, another student repeatedly touched him on the buttocks at school over a period of more than a week. Ms. White contacted the school but the school did not take action. The touching continued until K.K. grew angry and punched the student. At that point District staff reported the buttocks-touching to police as harassing conduct, but also suspended K.K. for two days for punching the other student.

     c.   Ms. White's mother attempted to speak to Ms. Levek about a concern involving her granddaughter, who is Black, and another student, and

Ms. Levek ignored Ms. White's mother for several minutes and then slammed the door in her face.

d. Ms. White's sister attempted to speak with Levek and Henningsen about issues her daughter K.D was experiencing with another student, and both Levek and Henningsen commented that K.D. was making them take time away from their families. Ms. Levek also threatened that K.D. would end up in MPS.

320. There is a widespread custom in the district of taking harsh action against Black students when White students complain about them.

a. Levek suspended student Miavia Prince for five days after white students alleged she stole a phone, when in fact Ms. Prince simply owned a phone of the same type and color as the phone the white students alleged she stole.

b. A white student complained that someone had stolen a graphing calculator, and Levek assumed that Prince stole it because she was the only Black student in the class. The student who lost the calculator later realized she had loaned it to a friend.

321. The widespread customs alleged above are so permanent and settled that they constitute de facto policy.

322. Defendants' adherence to these widespread customs caused the violation of K.K.'s constitutional rights, such that the District is liable to K.K for

compensatory damages, attorney fees, litigation costs, and all expenses associated with this action pursuant to 42 U.S.C. § 1983.

323.    Further, in order to prevent future harm arising from the District's inequitable practices, K.K. is entitled to an injunction ordering the District to follow policy in responding to Black students complaints about misconduct by other students and respond to Black students complaints with the same care it applies to white students complaints.

## COUNT IV: FINAL POLICYMAKER (K.K. against Board)(14th Amendment/§1983/Monell)

324.    Plaintiff reincorporates and realleges all previous paragraphs.

325.    At all times relevant to this complaint, pursuant to state law and District policy, Defendant Thomsen was vested with authority as a final policymaker for the Whitefish Bay School District.

326.    At all times relevant to this complaint, pursuant to state law and District Policy, Defendant Levek was vested with authority as a final policymaker for the Whitefish Bay School District with respect to the High School.

327.    The policy to deny K.K. an impartial suspension hearing, deny K.K. the opportunity to review evidence and confront witnesses, deny K.K. an impartial decisionmaker in the appeal process, and decline to consider relevant evidence favorable to K.K. was designed and carried out by Defendants Levek and Thomsen acting in their capacity as final decisionmakers for the District and is therefore attributable to the District.

328. The policy to treat K.K. more harshly than similarly situated white students in the discipline process by referring initial investigation to police, assessing the credibility of allegations against him based on the conduct of others of his race, and systematically crediting the allegations of white statements while systematically discrediting K.K.'s statements was designed and carried out by Defendants Levek and Thomsen acting in their capacity as final decisionmakers for the District and is therefore attributable to the District.

329. The policy to treat K.K. less favorably than similarly situated white students in responding to his complaints of misconduct by other students was designed and carried out by Defendants Levek and Thomsen acting in their capacity as final decisionmakers for the District and is therefore attributable to the District.

330. The policies pursued by Thomsen and Levek acting in their capacities as final policymakers for the district were the direct and proximate cause of violations of K.K.s Procedural Due Process and Equal Protection Rights.

331. The District is therefore liable to K.K for compensatory damages, attorney fees, litigation costs, and all expenses associated with this action pursuant to 42 U.S.C. § 1983.

332. Further, in order to prevent future harm arising from the documentation of the suspension and shooting threat on K.K.'s high school record, K.K. is entitled to an injunction ordering the District to expunge the suspension and shooting threat from K.K.'s record.

## COUNT V: FIRST AMENDMENT VIOLATION (Sec. 1983)(Plaintiff White Against Defendants Levek and Thomsen).

333.    Plaintiff reincorporates and realleges all previous paragraphs.

334.    The First Amendment prohibits threats of punishment designed to discourage future protected speech. Surita v. Hyde, 665 F.3d 860, 878 (7th Cir. 2011).

335.    Plaintiff White has a clearly established right under the First Amendment to peacefully protest the actions of school administrators on public property across the street from a school building in a manner that conforms with local ordinances.

336.    On the evening of September 29, 2023, Plaintiff White communicated to Sergeant Rossman that she planned to peacefully protest the actions of the Administrators by standing with a group of supporters across the street from the High School during the homecoming dance.

337.    Plaintiff White further stated to Sergeant Rossman that she would follow all Whitefish Bay ordinances applicable to her intended protest, including that she would not impede traffic and would not use a loudspeaker.

338.    Sergeant Rossman told Defendants Levek and Thomsen that Ms. White's intended to protest their conduct during the homecoming dance.

339.    Acting under color of law, Defendants Levek and Thomsen instructed Sergeant Rossman to convey a threat to Ms. White that she would be immediately arrested if she set foot on school property.

340.    Sergeant Rossman conveyed the threat of arrest to Ms. White.

341. Ms. White's expressed intent to publicly criticize Levek's actions was a motivating cause of Levek and Thomsen's decision to issue the threat of arrest.

342. Levek and Thomsen intended the threat of arrest to deter Ms. White from engaging in her intended protest.

343. Being contacted by a uniformed police officer and told that one's child's school administrators had ordered one's arrest if one entered school grounds would deter a person of ordinary firmness from holding a protest of those administrator's actions across the street from the school.

344. As a result of the Administrators' threat as conveyed by Sergeant Rossman, Ms. White did not hold her intended protest.

345. By directing officer Rossman to issue the threat, Defendants Levek and Thomsen, acting under color of law, deprived Ms. White of her right to free speech in violation of the First and Fourteenth Amendments to the U.S. Constitution, and caused her emotional distress and humiliation. Ms. White is thus damaged in violation of 42 U.S.C. § 1983.

346. Ms. White is entitled to compensatory damages, attorney fees, litigation costs, and all expenses associated with this action pursuant to 42 U.S.C. § 1983.

347. The actions of Defendants Levek and Thomsen were malicious, intentional, or reckless and therefore justify an award of punitive damages.

## COUNT VI: DISTRICT POLICY OR CUSTOM (Ms. White against Board)(1st Amendment/§1983/Monell)

348. Plaintiff reincorporates and realleges all previous paragraphs.

349. Defendants Levek, Henningsen, and Thomsen violated Ms. White's First Amendment rights pursuant to a widespread custom within the Whitefish Bay school district of suppressing criticism of school leaders related to racial disparities in the District.

350. This custom is so permanent and settled that it constitutes formal policy.

351. Defendants' adherence to these widespread customs caused the violation of K.K.'s constitutional rights, such that the District is liable to K.K for compensatory damages, attorney fees, litigation costs, and all expenses associated with this action pursuant to 42 U.S.C. § 1983

## COUNT VII: FINAL POLICYMAKER (Ms. White against Board)(1st Amendment/§1983/Monell)

352. Plaintiff reincorporates and realleges all previous paragraphs.

353. At all times relevant to this complaint, pursuant to state law and District policy, Defendant Thomsen was vested with authority as a final policymaker for the Whitefish Bay School District.

354. At all times relevant to this complaint, pursuant to state law and District Policy, Defendant Levek was vested with authority as a final policymaker for the Whitefish Bay School District with respect to the High School.

355. The policy to threaten Ms. White with arrest so as to deter her from protesting racially discriminatory conduct outside the homecoming dance was

designed and carried out by Defendants Levek and Thomsen acting in their capacity as final decisionmakers for the District and is therefore attributable to the District.

356. The policy pursued by Thomsen and Levek acting in their capacities as final policymakers for the district was the direct and proximate cause of the violation of Ms. White's First Amendment Rights.

357. The District is therefore liable to Ms White for compensatory damages, attorney fees, litigation costs, and all expenses associated with this action pursuant to 42 U.S.C. § 1983.

## COUNT VIII: FIRST AMENDMENT VIOLATIONS (Ms. White and K.K. against School Board)(§ 1983)

358. Plaintiff realleges and reincorporates all preceding paragraphs.

359. The First Amendment protections for free speech apply to speaking at public school board meetings as a school board meeting is a limited public forum.

360. "A limited public forum, as opposed to a traditional public forum such as a street or a park, refers to a forum that the government intentionally opens for public discourse. Even though the government does not have to open a limited public forum in the first place, once it does so any restrictions on speech within the forum must be reasonable in light of the forum's purpose and may not constitute viewpoint discrimination." Pichelmann v. Madsen, 31 F. App'x 322, 327 (7th Cir. 2002) (citations omitted).

361. Defendant School Board has created a limited public forum by opening its regular meetings for public comment, and thus is prohibited from discriminating against or limiting speech on the basis of viewpoint.

362. Criticism of school administrators is essential to the operation of school boards. The First Amendment prohibits the exclusion and censorship of such criticism from public comment at school board meetings.

363. Defendant School Board does not typically prohibit members of the public from identifying administrators by name during public comment.

364. Departing from its usual practice, Defendant School Board issued a special rule barring the public from identifying administrators by name during public comment at the two board meetings at which the Board heard appeals of K.K.s discrimination and harassment complaints.

365. The rule barring the public from identifying administrators by name during public comment was designed to suppress criticism of the administrators.

366. The board applied the rule only to the two appeal meetings because it knew that Ms. White, K.K., and their supporters held critical views about school administrators and were likely to express those views during public comment at the appeal meetings.

367. The rule prohibiting members of the public from identifying administrators by name violated the First Amendment on its face by impermissibly discriminating against speech on the basis of content and viewpoint.

57

368. The rule prohibiting the public from identifying administrators by name was not a reasonable limitation that advanced the meetings' purpose, which was for the board to hear information and perspective relevant to K.K.'s appeals, but rather served only to suppress and chill disfavored commentary.

369. The rule prohibiting the public from identifying administrators by name was a content-based restriction on speech that was not the least restrictive means of achieving a compelling government interest.

370. The rule violated the First Amendment by discriminating on viewpoint.

371. As applied against Ms. White and K.K., the rule violated their right of free speech by impermissibly discriminating against their speech on the basis of content and viewpoint.

372. As applied against Ms. White and K.K., the rule violated their right to assemble and petition the government by impermissibly discriminating against the speech of their supporters on the basis of content and viewpoint.

373. In violating Ms. White and K.K.'s First Amendment rights, the Defendant School Board and its members acted in a manner that was reckless, callous, intentional or malicious.

374. The School Board's members singled out Ms. White, K.K., and their supporters for their views and censored them in a manner that evinces complete disregard for Ms. White and K.K.'s well-established First Amendment rights.

375.    Ms. White and K.K. are thus damaged in violation of 42 U.S.C. § 1983, and therefore entitled to compensatory damages, punitive attorney fees, litigation costs, and all expenses associated with this action.

## COUNT IX: DEFAMATION (Ms. White against Defendants Levek and District)(Wisconsin Common Law)

376.    Plaintiff reincorporates and realleges all previous paragraphs.

377.    On the evening of September 29, 2023, Defendant Levek made the following statement to Officer Rossman: "At our last football game, K.K.'s mom was there and did kind of get into it with this other mom, they went back and forth, the police were there and there was mention of a gun in that space too."

378.    Defendant Levek was referring to the altercation between M.S.'s family and K.K.'s family at the football game on September 8, 2023.

379.    Defendant Levek made the statement in knowing that Ms. White and K.K. had repeatedly reached out to District officials ahead of the September 8 football game to notify them that M.S was harassing K.K. and that M.S. was specifically threatening to cause a disruption at the football game.

380.    Defendant Levek made the statement in knowing that Ms. White and K.K. had asked for the District's support in preventing a disruption at the football game, and the District had declined to help because M.S. had made her threatening communications outside of school hours and off of school property.

381.    Defendant Levek made the statement in knowing that M.S.'s mother, and not Ms. White, had been the person who referenced a gun during the September 8 incident.

382.    Defendant Levek made the statement in knowing that Ms. White had been the individual to seek police involvement and report the gun comment to the police during the September 8 incident.

383.    Defendant Levek did not at any point in her conversation with Sergeant Rossman on the evening of September 29, 2023, communicate any of the facts enumerated in ¶¶ 307-311.

384.    The false statement that is the subject of a defamation action need not be a direct affirmation, but may also be an implication. Mach v. Allison, 2003 WI App. 11, ¶ 12

385.    By omitting the facts enumerated in ¶¶ 307-311from her statement to Sergeant Rossman, Defendant Levek created the defamatory implication that Ms. White was responsible for a making threat involving a gun at a high school football game.

386.    Defendant Levek communicated this defamatory implication to Sergeant Rossman with actual knowledge of its falsity or reckless disregard for its truth or falsity.

387.    Defendant Levek communicated this defamatory implication to Sergeant Rossman motivated by racial animus and ill will against Ms. White, K.K., and their family.

388. The implied statement that Ms. White made a threat involving a gun at a high school football game tends to harm the reputation of Ms. White by making her appear dangerous and irresponsible.

389. As a direct and proximate result of Defendant Levek's statement, Ms. White has experienced humiliation and mental anguish.

390. As a direct and proximate result of Defendant Levek's statement, Ms. White is deeply afraid that Sergeant Rossman and other members of the Whitefish Bay Police Department perceive her and her family as dangerous and irresponsible, such that she and her family cannot rely on the Police Department to keep them safe or to treat them fairly and objectively.

391. Defendant Levek made the defamatory statement while acting within the scope of her employment, such that the District is liable for her misconduct under the doctrine of respondeat superior.

392. Ms. White timely served notice of her defamation claim on Defendants Levek and District pursuant to Wis. Stat. § 893.80, and Defendants disallowed the claim.

393. Plaintiff White is entitled to the following relief: reasonable compensatory and punitive damages; attorney's fees and costs; equitable relief in the form of an order directing Defendants to send a letter to the Whitefish Bay Police Department acknowledging and correcting the defamatory statement; and such other and additional relief that this court deems equitable and just.

**A JURY TRIAL IS DEMANDED**

Dated this 23nd day of August, 2024.


Respectfully submitted,

*/s/ Elisabeth Lambert*
Attorney For Plaintiffs
State Bar No. 1114507
Wisconsin Education Law & Policy Hub
845 N. 11th St.
Milwaukee, WI 53233
Phone: (414)232-6504
Email: elisabeth@wisconsinELPH.org