# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SHANEEKA WHITE,
**Individually and on behalf of**
**her minor child, K.K.,**

      **Plaintiffs,**

      **v.**                       **Case No. 24-CV-1076**

**WHITEFISH BAY SCHOOL BOARD,**
**JOHN THOMSEN, AMY LEVEK,**
**JULIE HENNINGSEN, TIM LEMKE,**
**MIKE O'CONNOR, and MATT ROSE,**

      **Defendants.**

## DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Shaneeka White, individually and on behalf of her minor child, K.K., sues the Whitefish Bay School Board, former Whitefish Bay School District Superintendent John Thomsen, Whitefish Bay High School Principal Amy Levek, former Whitefish Bay High School Assistant Principal Julie Henningsen, Whitefish Bay School District Director of Pupil Services Tim Lemke, former Whitefish Bay Middle School Principal Matt O'Connor, and Whitefish Bay Middle School Associate Principal Matt Rose, under 42 U.S.C. § 1983 and Wisconsin law. Plaintiffs allege Defendants violated their constitutional rights under the First and Fourteenth Amendments and defamed them in violation of Wisconsin common law.

Defendants move to dismiss Plaintiffs' amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (Docket # 25.) For the reasons below, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

K.K. is a Black high school student living and attending school in the Whitefish Bay School District. (Am. Compl. ¶ 1, Docket # 14.) Plaintiffs assert that Black residents make up approximately 2.7 percent of the overall Whitefish Bay population, and Black students make up about 3 percent of the student population in Whitefish Bay schools. (*Id.* ¶¶ 21–22.) While most of Whitefish Bay consists of single-family homes, one neighborhood in the southwest corner of the village consists of apartments and townhome complexes. (*Id.* ¶¶ 23–24.) Plaintiffs allege that a significantly higher proportion of Black Whitefish Bay residents live in this neighborhood, including K.K. and his family. (*Id.* ¶¶ 25–26.) K.K. was a freshman at Whitefish Bay High School during the 2023-24 school year and was a member of the freshman football team. (*Id.* ¶¶ 28–29.)

### 1.    *Alleged Harassment by M.S.*

During the summer of 2023, K.K. dated M.S., a Black female student in the district. (*Id.* ¶ 30.) M.S. was going into eighth grade at Whitefish Bay Middle School. (*Id.* ¶ 31.) Around the start of the school year, K.K. ended his relationship with M.S. and asked a different female student, M.R., to the homecoming dance at the high school. (*Id.* ¶¶ 32–33.) Plaintiffs allege that M.S., angry about the breakup, along with another student, sent harassing text messages to K.K. and M.R. on the evening of Monday, September 4, 2023. (*Id.* ¶¶ 34–35.) Plaintiffs assert that the messages discussed K.K.'s relationship history with M.S. and referenced kissing and sexual activity. (*Id.* ¶ 36.) White, K.K.'s mother, notified the district, and district staff sent screen shots of the text messages to O'Connor, the middle school principal. (*Id.* ¶ 37.) Plaintiffs allege that O'Connor took no action in response to receiving this information. (*Id.* ¶ 39.)

Plaintiffs contend that M.S. continued to send threatening messages to K.K., including threatening to publish an explicit video of K.K. and threatening to ruin K.K.'s football season. (*Id.* ¶ 41.) Plaintiffs allege that M.S.'s actions negatively impacted K.K.'s ability to focus in school and on September 6, White emailed O'Connor stating that M.S.'s behavior was violating the district's bullying and harassment policy. (*Id.* ¶¶ 41–43.) Plaintiffs allege that O'Connor continued to take no action, informing White that because the initial text messages had been sent at night and did not have a direct correlation to school, the matter was best handled between the parents or with the Whitefish Bay Police Department. (*Id.* ¶ 44.)

On September 7, K.K. spoke with Henningsen, the assistant principal of the high school. (*Id.* ¶ 47.) K.K. told Henningsen that M.S. was threatening him, that it was affecting his ability to learn at school, and that he was concerned that M.S would cause a disruption during football. (*Id.* ¶ 48.) Plaintiffs assert that like O'Connor, Henningsen informed K.K. that because the texts had been sent after school hours, the district would not do anything. (*Id.* ¶ 49.) Plaintiffs allege that on the evening of September 8, the Whitefish Bay varsity football team played a home game at the high school. (*Id.* ¶ 52.) White, K.K., and M.R. attended the game. (*Id.* ¶ 53.) Plaintiffs allege that during the game, M.S. began following K.K. and M.R. around the stadium, making threatening gestures indicating she intended to fight M.R. (*Id.* ¶ 54.) K.K. called his mother, and White walked with M.R. to the stadium exit so she could safely leave the game. (*Id.* ¶¶ 55–56.)

Plaintiffs allege that White texted M.S. and asked to speak with her mother. (*Id.* ¶ 57.) Plaintiffs allege that M.S.'s mother and other family members approached White in an aggressive, threatening manner and M.S.'s mother told White that she had a gun. (*Id.* ¶¶ 58–59.) Plaintiffs assert that White asked nearby police officers to help defuse the situation, and

3

White told the officers about M.S.'s mother's reference to a gun. (*Id.* ¶¶ 60–61.) Following this incident, Henningsen interviewed White, M.S.'s mother, and M.R.'s mother. (*Id.* ¶ 62.) Plaintiffs assert that White reiterated to Henningsen that M.S. had sent threatening messages to K.K. and M.R. and the district told White to address the issue directly with M.S.'s parents, and while White attempted to communicate with M.S.'s parents, M.S.'s mother made a threat involving a gun. (*Id.* ¶ 63.) Plaintiffs allege that Henningsen did not take any action to discipline M.S. or protect K.K.; rather, she indicated that she believed White had behaved inappropriately by attempting to speak with M.S.'s mother at the game. (*Id.* ¶ 66.)

Plaintiffs further allege that M.S. shared an "intimate video" of K.K. on social media and while White reported the incident to Henningsen and high school principal Levek, they declined to take action on the grounds that M.S. had shared the video off school property and outside school hours. (*Id.* ¶¶ 71, 73.) On November 3, White filed a harassment complaint against M.S. using the district's online harassment complaint form pursuant to the School Board's anti-harassment policy. (*Id.* ¶ 74.) Plaintiffs allege that White received no written acknowledgement or notice of a screening decision, contrary to district policy. (*Id.* ¶¶ 75–78.)

2.    *Homecoming Parade Incident, Suspension, and Subsequent Appeals*

On September 29, 2023, the high school held a homecoming parade, in which K.K. walked in the parade as a member of the Freshman football team. (*Id.* ¶¶ 79–80.) Plaintiffs allege that two white students, who are brothers, walking behind K.K. in the parade—R.L., a senior and C.L., a freshman—began making fun of K.K. and K.K. reacted angrily. (*Id.* ¶¶ 83–90.) Plaintiffs allege that R.L. escalated the situation by insulting K.K.'s shoes and hair. (*Id.* ¶¶ 90–93.) C.L. joined in, insulting K.K., and K.K. insulted C.L. in return. (*Id.* ¶¶ 94–95.) Plaintiffs allege that R.L. then shoved K.K., causing him to stumble back, and K.K. decided

4

to walk away, telling R.L. and C.L. that "I'll have my mom handle you." (*Id.* ¶¶ 96–98.) After leaving school that day, K.K. alleges that outside of school hours, off school property, and from his personal device, he sent a series of Snapchat messages to C.L., saying he was willing to meet R.L. and "throw hands." (*Id.* ¶¶ 104–05.) Plaintiffs further allege, however, that shortly after sending the messages, K.K. sent another message to C.L. stating that he did not want to fight and suggested they leave each other alone. (*Id.* ¶ 106.)

Plaintiffs allege that R.L. approached Levek that day around 5:20 p.m. and told her that K.K. had initiated an altercation during the parade. (*Id.* ¶¶ 107–08.) Plaintiffs allege that R.L. told Levek that K.K. had made a threat to have his mom shoot R.L. (*Id.* ¶ 110.) Levek then spoke to C.L., who purportedly corroborated R.L.'s allegations. (*Id.* ¶ 117.) Plaintiffs allege that Levek then called the Whitefish Bay police and around 5:45 p.m., Sergeant Daniel Rossman met with Levek at the high school. (*Id.* ¶ 120.) Plaintiffs allege that Levek told Sergeant Rossman that at their last football game, White "got into it" with another student's mother and that the "police were there and there was mention of a gun in that space too." (*Id.* ¶ 122.) Plaintiffs allege that Levek's portrayal of White and K.K.'s family was based on a biased and stereotyping view that Black people are dangerous. (*Id.* ¶ 131.) Plaintiffs further allege that Levek and Sergeant Rossman then spoke about the neighborhood in which K.K. and his family lived and discussed problems with the families that live there. (*Id.* ¶ 134.)

Plaintiffs assert that Levek instructed Sergeant Rossman to find K.K. and tell him he was not permitted at the football game that evening or the homecoming dance the next day, but did not instruct Sergeant Rossman to get K.K.'s side of the story. (*Id.* ¶¶ 139–40.) Plaintiffs allege that later that evening, Levek discussed the matter with Henningsen and Superintendent Thomsen, who both agreed with Levek's decision to exclude K.K. from the

game and dance. (*Id.* ¶ 142.) Around 6:00 p.m. that night, Whitefish Bay police knocked on White's door and informed K.K. and his family that K.K. was not allowed to attend the homecoming dance or game because he had allegedly made a threat. (*Id.* ¶ 144.) White took K.K. to the police station to give his version of the events. (*Id.* ¶ 147.) K.K. denied making any threats and informed the police that R.L. had initiated the altercation and shoved K.K. (*Id.* ¶ 149.)

Plaintiffs allege that White told police she intended to protest Levek's actions by staging a peaceful demonstration across the street from the homecoming dance. (*Id.* ¶ 153.) Plaintiffs allege that Sergeant Rossman reported to Levek and Thomsen that K.K. denied making any threats; however, Levek stated she was still going to exclude K.K. from homecoming. (*Id.* ¶ 155.) Plaintiffs assert that Sergeant Rossman also informed Levek and Thomsen about White's demonstration plans, to which they directed Sergeant Rossman to tell White that if she sets foot on school property she would be arrested. (*Id.* ¶¶ 156–57.) Plaintiffs allege that Sergeant Rossman informed White around 8:00 p.m. that she would be arrested if she set foot on school property. (*Id.* ¶ 161.)

The next day, on Saturday, September 30, Thomsen contacted Levek and instructed her to meet with K.K. (*Id.* ¶ 166.) Levek and Henningsen spoke with K.K. and White by telephone, and K.K. told them that R.L. and C.L. had initiated the altercation, that R.L. had pushed him, and that he had said "I'll have my mom take care of you," not "I'll have my mom shoot you." (*Id.* ¶ 177.) White filed a bullying complaint against R.L. using the district's online bullying complaint form but did not receive any acknowledgment for more than two months. (*Id.* ¶¶ 185, 187.) That afternoon, Levek emailed White to confirm that K.K. would not be allowed to attend the homecoming dance that evening. (*Id.* ¶ 191.)

On Monday, October 2, Henningsen called White and informed her that the district had completed its investigation and would be imposing a 3-day suspension on K.K., which would also result in K.K. receiving an athletic suspension and missing a football game. (*Id.* ¶ 197.) On October 3, White filed a letter with the district's Director of Pupil Services, Lemke, complaining of racial discrimination against Levek and Henningsen, appealing K.K.'s suspension, and complaining that R.L. and C.L. had bullied and harassed K.K. during the parade. (*Id.* ¶ 211.) On October 5, K.K., White, K.K.'s stepfather, and Plaintiffs' attorney met with Lemke, Levek, and the district's counsel Chrissy Hamiel. (*Id.* ¶ 213.) On November 13, Lemke issued a decision upholding K.K.'s suspension and finding that Levek and Henningsen had not discriminated against K.K. based on race. (*Id.* ¶ 228.) White appealed the November 13 decision. (*Id.* ¶ 235.)

On December 11, White, along with her counsel, met with Thomsen regarding the appeal. (*Id.* ¶ 241.) White told Thomsen that she had not received a response to the harassment complaint submitted on September 30 regarding R.L. and C.L., or the sexual harassment complaint she filed against M.S. around November 2. (*Id.* ¶ 242.) On December 13, Henningsen emailed White an administrative determination summarily dismissing the two harassment complaints. (*Id.* ¶ 244.) On December 15, Thomsen issued a determination regarding White's appeal of Lemke's decision that declined to consider evidence White presented at the December 11 meeting with respect to the alleged racially discriminatory nature of Levek's and Henningsen's conduct. (*Id.* ¶¶ 248–49.) On December 21, White appealed Henningsen's administrative determination regarding the two harassment complaints to Thomsen. (*Id.* ¶ 251.)

On January 4, 2024, Thomsen met with White and K.K. regarding their appeal of Henningsen's dismissal of the two harassment complaints. (*Id.* ¶ 252.) On January 12, Thomsen issued a decision upholding the dismissal. (*Id.* ¶ 257.)

3. *Proceedings Before the School Board*

On January 19, White appealed the determinations of the discrimination complaint, the suspension appeal, and the two harassment appeals to the School Board. (*Id.* ¶ 260.) White was informed by Attorney Hamiel that the Board would hear White's appeals in a series of two closed-session meetings in which any student besides K.K. was to be referred to as "Student A, Student B, etc." and any administrator was to be referred to as "Administrator A, Administrator B, etc." (*Id.* ¶¶ 261–62.) Plaintiffs allege that White, K.K., and their counsel attended the two meetings with the Board and presented their arguments; however, the restrictions regarding identifying students and administrators made their presentation difficult and confusing. (*Id.* ¶¶ 268–72.)

During the second of the two meetings, Plaintiffs allege that several community members came to speak in support of White and K.K. during the public comment period before the Board went into closed session. (*Id.* ¶ 273.) They allege that the Board applied the rule prohibiting discussion of administrators by name to the public comment period. (*Id.* ¶ 274.) Plaintiffs allege that the Board does not usually require members of the public who are speaking in public comment to refer to administrators by letters instead of name and only imposed this rule because it knew that the speakers were likely to criticize administrators for their handling of racial issues in the district. (*Id.* ¶¶ 275–76.)

Following the meetings, the Board issued two decisions—the "Harassment Decision" and the "Discrimination Decision." (*Id.* ¶ 292.) The Harassment Decision upheld Thomsen's

determination that R.L. and M.S. had not harassed K.K. and the Discrimination Decision did not answer whether Levek and Henningsen had discriminated against K.K. by applying discipline inequitably to him and denying him due process, even though that was the gravamen of White's complaint. (*Id.* ¶¶ 293–94.)

Plaintiffs allege that K.K. has experienced persistent bullying and harassment at school throughout his time as a student in the district, including being called racial slurs. (*Id.* ¶¶ 297–300.) Plaintiffs further allege that the district disproportionately disciplines Black students, despite white students engaging in similar behavior. (*Id.* ¶¶ 304–340.)

## STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this language to require that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Ashcroft v. Iqbal*, the Supreme Court elaborated further on the pleadings standard, explaining that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," though this "standard is not akin to a 'probability requirement.'" 556 U.S. 662, 678 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When determining the sufficiency of a complaint, the court should engage in a two-part analysis. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). First, the court

must "accept the well-pleaded facts in the complaint as true" while separating out "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.* (citing *Iqbal*, 556 U.S. at 680). Next, "[a]fter excising the allegations not entitled to the presumption [of truth], [the court must] determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *Id.* (citing *Iqbal*, 556 U.S. at 681). As explained in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. All factual allegations and any reasonable inferences must be construed in the light most favorable to the nonmoving party. *Price v. Bd. of Educ. of City of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

## ANALYSIS

Plaintiffs bring nine causes of action against the various defendants under federal and state common law. As an initial matter, Plaintiffs request to withdraw Counts IV and IX which allege an equal protection claim by K.K. against the Board and a defamation claim by White against Levek and the district, respectively. (Docket # 34-1 at 24.) Plaintiffs ask that these two claims be dismissed without prejudice. (*Id.*) To the extent Plaintiffs intend to invoke Fed. R. Civ. P. 41(a), this rule speaks to dismissing an "action"—i.e., the entire case—not individual claims. *See Taylor v. Brown*, 787 F.3d 851, 857 (7th Cir. 2015). If Plaintiffs wish to dismiss these individual claims, they must follow the procedure found in Fed. R. Civ. P. 15(a), as this rule "allows a plaintiff to amend his complaint—including by adding or dropping parties and claims." *Id.* at 857–58.

Defendants, however, argue that because they moved to dismiss these claims under Fed. R. Civ. P. 12(b)(6) and Plaintiffs failed to substantively respond to Defendants' motion

as to these counts, the claims should be deemed abandoned and dismissed with prejudice. (Docket # 35 at 15.) Alternatively, Defendants argue that Plaintiffs should file a second amended complaint that removes Counts IV and IX. Because the time to amend as a matter of right under Fed. R. Civ. P. 15(a)(1) has passed, Plaintiffs must either obtain the defendants' written consent or seek the court's leave under Rule 15(a)(2) to file a second amended complaint. I will construe Defendants' alternative argument as providing its written consent for Plaintiffs to file a second amended complaint removing Counts IV and IX. Thus, Plaintiffs are permitted to file a second amended complaint removing Counts IV and IX.

In the remainder of the amended complaint, Plaintiffs allege violations of their procedural due process rights, their equal protection rights, and their First Amendment rights. Defendants move to dismiss the entirety of Plaintiffs' complaint. I will address each claim in turn.

1. *Procedural Due Process Claims Against All Defendants (Count I)*

In Count I, Plaintiffs allege that "all defendants" deprived K.K. of his property interest in a public education by suspending him from school, barring him from participating in homecoming activities, and suspending him from the football team, without due process of law. (Am. Compl. ¶ 343.) Plaintiffs further allege the defendants deprived K.K. of his liberty interest in his reputation; in participating in school events, activities, and sports; and in pursuing his goal of attending college and playing collegiate sports. (*Id.* ¶ 344.) Plaintiffs allege that Levek, Henningsen, Lemke, and Thomsen prejudged K.K.'s guilt and conducted a sham investigation. ( *Id.* ¶ 356–59, 363.)

11

### 1.1 Procedural Due Process Claims Against O'Connor, Rose, and the School Board

As an initial matter, while Count I is plead against "all defendants," Plaintiffs only allege actions taken by Levek, Henningsen, Lemke, and Thomsen. For a defendant to be liable under § 1983, he or she must have participated directly in the constitutional violation. *Hildebrandt v. Illinois Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). In other words, "'liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.'" *Id.* (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). At the time of the alleged actions, K.K. was a student at Whitefish Bay High School. O'Connor and Rose are the principal and associate principal of the middle school, respectively. Plaintiffs allege no facts that either O'Connor or Ross were involved in the decision to suspend K.K. or bar him from attending homecoming activities at the high school. Thus, to the extent Plaintiffs bring Count I against O'Connor and Rose, those claims are dismissed.

Further, to the extent Plaintiffs intend to bring Count I against the School Board, this is redundant of the *Monell* claim brought in Count II. As such, any claim in Count I against the School Board is dismissed.

### 1.2 Procedural Due Process Claims Against Lemke and Thomsen

The facts as alleged in the amended complaint indicate that it was Levek and Henningsen who conducted the investigation and made the decision to suspend K.K, not Lemke or Thomsen. (Am. Compl. ¶¶ 107–205.) Lemke and Thomsen were involved in the decisions reviewing and upholding K.K.'s suspension. (*Id*. ¶¶ 228, 248.) Due process, however, "only requires the initial pre-suspension notice . . . [t]he completely gratuitous review by the school board neither is required by due process nor gives rise to any due process

12

rights." *Smith*, 129 F.3d at 429. Thus, to the extent Plaintiffs bring a procedural due process claim against Lemke and Thomsen in Count I, these claims are dismissed.

### 1.3 Procedural Due Process Claims Against Levek and Henningsen

Plaintiffs' procedural due process claims arise under the Fourteenth Amendment, which prohibits state officials from depriving individuals of life, liberty, or property without due process of law. *Isabella A. by David A. v. Arrowhead Union High Sch. Dist.*, 323 F. Supp. 3d 1052, 1057 (E.D. Wis. 2018). To demonstrate a violation of procedural due process rights guaranteed by the Fourteenth Amendment, a plaintiff must establish (1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the failure to employ constitutionally adequate procedures. *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016). Defendants do not appear to challenge, for purposes of this motion, the second element of Plaintiffs' procedural due process claim—whether the deprivation of interest occurred by some form of state action. Thus, I will address only the remaining two elements of Plaintiffs' procedural due process claim.

#### 1.3.1 Cognizable Liberty or Property Interest

Plaintiffs allege Defendants deprived K.K. of his property interest in public education by suspending him from school, barring him from participating in homecoming activities, and suspending him from the football team (Am. Compl. ¶ 343) and deprived him of his liberty interest in his reputation (*id.* ¶ 344). K.K. undoubtedly has both a property and liberty interest in attending a state-established and state-maintained school system. *See Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 428 (7th Cir. 1997) (citing *Goss v. Lopez*, 419 U.S. 565 (1975)). Thus, K.K. is entitled to due process regarding his 3-day suspension. *See id.* K.K.'s claims

regarding participating in homecoming events, his suspension from the football team, and his reputational interests, however, do not rise to the level of constitutionally protected interests.

As one court in this district found, while the Seventh Circuit has not squarely addressed the issue of whether participation in high school athletics is a protected interest, the vast majority of circuits have held that it is not and courts within this Circuit have followed the majority view. *Isabella A.*, 323 F. Supp. 3d at 1058. The majority's view is sound. The Supreme Court has found that to "have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Students are not entitled to participate in extracurricular activities. They are voluntary and a "privilege at the High School." *See Todd v. Rush Cnty. Sch.*, 133 F.3d 984, 986 (7th Cir. 1998). For this reason, courts have upheld as constitutional certain requirements for extracurricular participation, such as submitting to random drug testing. *Id.* Because K.K. does not have a protected liberty or property interest in playing football or attending the homecoming events, his procedural due process claim as to these alleged deprivations fails.

K.K. also alleges he has a liberty interest in his reputation. Reputation, however, is not a property or liberty interest within the meaning of the due process clause. *Bowens v. Quinn*, 561 F.3d 671, 675 (7th Cir. 2009). For a plaintiff to establish a protectible liberty interest, he must establish more than stigma; rather, "the plaintiff also must establish the alteration of legal status." *Brown v. City of Michigan City, Indiana*, 462 F.3d 720, 731 (7th Cir. 2006). In other words, the plaintiff must show the alteration or extinguishment of a right or status previously recognized by state law. *Id.* at 730.

14

While Plaintiffs allege that false statements on K.K.'s disciplinary record caused him "stigmatic harm that altered his legal status and rights" (Am. Compl. ¶ 350), Plaintiffs cannot merely invoke the legal standard. They must allege facts that plausibly suggest an entitlement to relief. And the facts alleged do not rise to the standard of "alteration of legal status." The Seventh Circuit has recognized reputational harm as a cognizable interest in such cases where the defamation "casts doubt on the individual's reputation or character in such a manner that it becomes *virtually impossible*" for the individual to, for example, find employment in his chosen field. *See O'Gorman v. City of Chicago*, 777 F.3d 885, 891 (7th Cir. 2015) (emphasis added); *see also Sines v. Cnty. of Fulton*, No. 3:24-CV-553 DRL-SJF, 2025 WL 671222, at *2 (N.D. Ind. Feb. 28, 2025) (collecting cases).

In this case, while Plaintiffs allege that "many colleges and universities" require candidates to disclose their high school disciplinary records as part of their application process and that having a "shooting threat falsely documented" is "likely to impede K.K. in his pursuit of college admission and an athletic scholarship," (Am. Compl. ¶¶ 348–49), these speculative allegations are a far cry from the *O'Gorman* court's statement that the defamation must make it "virtually impossible" for the person to achieve their stated goal. Thus, Plaintiffs' procedural due process claim as to K.K.'s alleged reputational harm also fails.

### 1.3.2    Constitutionally Adequate Process

While Plaintiffs' amended complaint sufficiently alleges that K.K. has a constitutionally protected interest regarding his 3-day suspension, Plaintiffs must also allege facts showing that they failed to receive constitutionally adequate process. Plaintiffs' assertion that they did not receive constitutionally adequate process is two-fold. First, Plaintiffs allege that the process afforded fell short of the requirements articulated by the Supreme Court in

15

*Goss v. Lopez*, 419 U.S. 565 (1975), the landmark decision governing procedural due process claims in the context of high school suspensions. (Docket # 34-1 at 3–7.) And second, Plaintiffs allege that Levek and Henningsen were biased and predetermined K.K.'s guilt. (*Id.* at 7–11.)

### 1.3.2.1 Due Process Under *Goss*

In *Goss*, nine high school students were suspended from a public school in Columbus, Ohio for 10 days without a hearing pursuant to Ohio law. 419 U.S. at 568. The students sued the Columbus Board of Education and various administrators under § 1983, asserting that they were denied their right to procedural due process. *Id.* at 568–69. The Board argued that a 10-day suspension is neither a "severe nor grievous" loss; thus, due process was not required prior to the suspension. *Id.* at 575–576. The Court disagreed, concluding that a 10-day suspension from school "is not de minimis in our view and may not be imposed in complete disregard of the Due Process Clause." *Id.* at 576.

The Court reasoned that a "short suspension is, of course, a far milder deprivation than expulsion" and determination of the process due is an "intensely practical matter[ ]" that does not lend itself to "inflexible procedures universally applicable to every imaginable situation." *Id.* at 576–77 (internal quotation and citation omitted). Stating that the fundamental requisite of due process is the opportunity to be heard, the Court concluded that in cases involving suspensions of 10 days or less, due process requires "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. The Court further found that no delay was necessary between the time notice is given and the time of the discussion with the student. *Id.* at 582. In other words, in "the great

16

majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred" and that it was holding only that "in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is." *Id.*

The Court explained that it was "stop[ping] short" of construing the due process clause to require that students be afforded the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident" in cases of short suspensions. *Id.* at 583. The Court stated that brief disciplinary suspensions "are almost countless" and to impose in each case "even truncated trial-type procedures" might "overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness." *Id.* The Court further acknowledged, however, that it was not "put[ting] aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required." *Id.*

While Plaintiffs acknowledge *Goss* controls in this case, they argue that courts applying *Goss* have found that in cases involving credibility disputes, or in cases where a student faces particularly damaging accusations, a more robust procedure is required. (Docket # 34-1 at 4.) Plaintiffs cite *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) in support of this proposition. (*Id.*) *Doe*, however, is inapposite. *Doe* involved a case of alleged sexual violence where a university student was suspended for an academic year with conditions imposed on his readmission. *Id.* at 656. In addressing *Goss*, the *Doe* court specifically noted that *Goss* teaches that the "process due depends on a number of factors, including the severity of the consequence and the level of education," stating that a "10-day suspension warrants fewer

17

procedural safeguards than a longer one" and that "universities are subject to more rigorous requirements than high schools." *Id.* at 663. In finding the student in *Doe* was entitled to "relatively formal procedures," the court noted that he was "suspended by a university rather than a high school, for sexual violence rather than academic failure, and for an academic year rather than a few days." *Id.* The *Doe* court did not consider whether the evidence involved credibility contests in determining whether a more formal procedure was due.

In fact, as stated above, the *Goss* Court found that it was *not* construing the due process clause to require that hearings in connection with short suspensions afford students the opportunity to confront and cross-examine witnesses supporting the charge, or to call their own witnesses to verify their versions of the incident. 419 U.S. at 583. Stated differently, the *Goss* Court found that the opportunity to challenge the credibility of one's accusers was *not* required in cases of short suspensions.

And in this case, Plaintiffs allege that Whitefish Bay police, at the request of Levek, informed K.K. and White at 6:00 p.m. on September 29 that K.K. was not allowed to attend the homecoming game or dance because of the alleged threat. (Am. Compl. ¶ 144.) K.K. and White then went to the police station and told police that R.L. had initiated the altercation and shoved K.K., and that K.K.'s statement had been "I'll have my mom take care of you," not "I'll have my mom shoot you." (*Id.* ¶ 149.) Plaintiffs allege that Sergeant Rossman conveyed this information to Levek and Thomsen. (*Id.* ¶ 154.) On September 30, Levek and Henningsen spoke with K.K. and White by telephone, noting that this "was the first opportunity K.K. had to tell anyone from the District his side of the story." (*Id.* ¶¶ 175–76.) Plaintiffs allege K.K. was able to tell Levek and Henningsen that R.L. and C.L. had initiated the altercation, that R.L. had pushed him, and that he had said "I'll have my mom take care

18

of you," not "I'll have my mom shoot you." (*Id.* ¶ 177.) The district made the decision to impose a 3-day suspension on October 2 after completing its investigation. (*Id.* ¶¶ 196–97.)

Based on the facts alleged in Plaintiffs' amended complaint, K.K. received the rudimentary process required by *Goss* for short suspensions—he was given notice of the charges against him and had the opportunity to present his side of the story. While Plaintiffs allege that the district refused to provide White details of the investigation, such as "who the witnesses were and what they had said," (*id.* ¶ 201), it is clear from Plaintiffs' allegations as pled that they were aware of the accusation made (i.e., that K.K. had said "I'll have my mom shoot you") and that the accusers were R.L. and C.L. (*id.* ¶¶ 149–50, 154, 177). That the evidence consisted of K.K.'s word against R.L.'s and C.L.'s does not change the process required by *Goss*.

### 1.3.2.2   Biased Decision-Makers

Plaintiffs further allege, however, that Levek and Henningsen prejudged K.K.'s guilt and conducted a "sham" investigation before suspending him. (*Id.* ¶ 356.) Biased decision-making violates due process because if the procedures used to investigate the charges are a "sham" and the decision-maker has already prejudged a student's guilt, then the student has not truly been given a constitutionally sufficient opportunity to respond, as required by *Goss*. *See Hess v. Bd. of Trustees of S. Illinois Univ.*, 839 F.3d 668, 675 (7th Cir. 2016); *Levenstein v. Salafsky*, 164 F.3d 345, 351 (7th Cir. 1998).

 Plaintiffs argue they have alleged sufficient facts supporting Levek's and Henningsen's bias in investigating and suspending K.K. (Docket # 34-1 at 8–9.) Defendants rely heavily on the law stating that there is a presumption that administrators are honest and impartial and the burden of rebuttal is "heavy," stating that to carry that burden, "the party claiming bias

must lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." *Hess*, 839 F.3d at 675. Defendants argue that none of the facts alleged plausibly indicate that Levek and Henningsen prejudged K.K.'s guilt. (Docket # 26 at 9.)

I disagree. Plaintiffs allege a series of facts that if true, could demonstrate actual bias on the part of the decisionmakers. Plaintiffs allege that when Levek met with Sergeant Rossman the evening of September 29, she told him that White had previously been involved in an incident with another mother during a football and that the "police were there and there was mention of a gun," despite knowing that it was M.S.'s mother, not White, who made a gun threat. (Am. Compl. ¶¶ 120–26.) Levek further allegedly told Sergeant Rossman that K.K.'s family was "not a new family that we've dealt with" and there "have been altercations with them before." (*Id.* ¶ 122.) Levek also allegedly spoke to Sergeant Rossman regarding troubles with "these families" living in the predominantly Black neighborhood in Whitefish Bay, stating that they were "as tired of it as [the police] are." (*Id.* ¶ 134.) Plaintiffs further allege that neither Levek nor Henningsen would have spoken to K.K. to get his side of the story without Thomsen ordering them to do so on September 30, despite having already spoken to the white students involved in the incident—R.L. and C.L. (*Id.* ¶¶ 117, 166–69.) Plaintiffs allege that Henningsen told Levek on September 30 that she was "so pissed" after Levek informed her that Thomsen wanted them to speak with K.K.. (*Id.* ¶ 168.) These allegations immediately preceded Henningsen's and Levek's decision on October 2 to impose a 3-day suspension on K.K. (*Id.* ¶¶ 196–97.)

Defendants confuse Plaintiffs' burden at the motion to dismiss stage. While Defendants are correct that it is not improper to cite summary judgment decisions at the

motion to dismiss stage to determine what substantive legal standard applies to the pleadings (Docket # 35 at 2 n.1, citing *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014)), it does not follow that Plaintiffs must identify evidence in support of a *prima facie* case at the pleading state, *see Adams*, 742 F3d at 728. While Plaintiffs may have a heavy burden to rebut the administrator's presumption of non-bias, their amended complaint alleges sufficient facts to allow them to go forward with discovery on this claim.

In short, Count I of Plaintiffs' Amended Complaint alleging procedural due process claims against Levek and Henningsen regarding K.K.'s 3-day suspension may go forward. The remainder of Plaintiffs' claims in Count I are dismissed.

### 2.    *Procedural Due Process Claim Against the School Board (Count II)*

In *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court held that municipalities and other local governmental bodies are "persons" within the meaning of § 1983. *Id.* at 689. However, a municipality is not liable under § 1983 unless the alleged deprivation of constitutional rights was caused by a municipal policy or custom. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) ("[I]n *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."). A plaintiff may establish municipal liability by showing "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009).

Plaintiffs allege in Count II that the School Board is the final policymaker for the district pursuant to Wisconsin statute. (Am. Compl. ¶ 366.) They allege that the School Board knew that Levek, Henningsen, Lemke, and Thomsen conducted a "sham investigation" and biased appeals processes. (*Id.* ¶¶ 368–69.) Plaintiffs further allege that the School Board itself conducted a biased appeals hearing. (*Id.* ¶ 370.)

It appears Plaintiffs attempt to hold the School Board liable under the theory that, as the final policymaking authority, it caused K.K.'s constitutional injury. In order to succeed on this theory, Plaintiffs must show that the School Board "was directly responsible for the deprivation." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001). As to the actions of Levek, Henningsen, Lemke, and Thomsen, Plaintiffs argue that the School Board is liable based on a "ratification theory," meaning that the Board adopted its employees' actions as its own. *Waters*, 580 F.3d at 584. It is insufficient, however, for the policymaker to merely approve another's decision; for municipal liability to attach, "a municipality must approve both the employee's conduct and the basis for that conduct, i.e., the employee's motivation." *Id.*

As to Lemke and Thomsen, again, Plaintiffs fail to state a procedural due process claim against them. Thus, without an underlying constitutional violation, Plaintiffs cannot proceed on a *Monell* claim based on Lemke's and Thomsen's alleged actions. *Fulton v. Bartik*, 547 F. Supp. 3d 799, 819 (N.D. Ill. 2021) ("*Monell* liability cannot survive without an underlying constitutional violation by an individual defendant."). As to Levek and Henningsen, however, Plaintiffs sufficiently allege that the Board ratified Levek's and Henningsen's actions. Plaintiffs allege that the Board knew Levek and Henningsen deprived K.K. of adequate process (Am. Compl. ¶ 368) and failed to take any action to correct or remedy the

violation (*id.* ¶ 373). The Seventh Circuit has stated that "*deliberate* inaction might be convincing evidence of delegation of final decisionmaking authority, or of ratification." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 470 (7th Cir. 2001) (emphasis in original). As Plaintiffs' complaint alleges the Board deliberately failed to act to correct the violation of K.K.'s due process rights, the *Monell* claim against the Board as to Levek and Henningsen may go forward.

     3.     *Equal Protection-Discipline Claim Against Levek, Henningsen, Lemke, and Thomsen (Count III)*

The Equal Protection Clause of the Fourteenth Amendment prohibits state and local governments from discriminating on the basis of certain protected classifications. *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012). For an equal-protection claim based on class membership to survive a motion to dismiss, a plaintiff must sufficiently allege that they were treated differently by the government based on membership in a protected class, and that the defendant acted with discriminatory intent. *Id.*

In Count III, Plaintiffs allege that Levek, Henningsen, Lemke, and Thomsen treated K.K. differently during his suspension proceedings and subsequent appeals based on his race. (Am. Compl. ¶¶ 379–84.) As above, while the amended complaint makes several conclusory allegations that Lemke and Thomsen prejudged K.K.'s guilt and conducted a sham investigation (*id.* ¶¶ 356–56), the factual statements do not support that either Lemke or Thomsen were involved in the investigation leading to K.K.'s suspension or in the decision to punish K.K. Furthermore, beyond general allegations that Lemke and Thomsen engaged in a biased appeals process (*id.* ¶¶ 268, 369), the amended complaint contains no facts that would plausibly support that either of these defendants acted with discriminatory intent while engaging in their part of the appeals process. Rather, Plaintiffs allege that in rendering their

23

respective decision, neither Lemke nor Thomsen considered all of the evidence White presented in support of K.K. (*Id.* ¶¶ 230–34, 248–49.) Plaintiffs allege no facts, however, to support that any of these actions were taken because of K.K.'s race. For these reasons, Count III as to Lemke and Thomsen is dismissed.

As to Levek and Henningsen, however, as above, I find the amended complaint sufficiently states a claim against these defendants. Again, the incident underlying K.K.'s discipline involved an altercation between two white students—R.L. and C.L.—and K.K., a Black student. Plaintiffs allege that R.L. and C.L. made false allegations regarding a gun against K.K. to Levek, and Levek and Henningsen called the police and spoke to witnesses identified by R.L. and C.L. before getting K.K.'s side of the story. (*Id.* ¶¶ 107–111, 117, 119, 171–73.) Plaintiffs allege that when speaking to law enforcement, Levek stated that White was previously involved in an incident with another parent at a football game and "there was mention of a gun in that space too," despite knowing that it was another parent, not White, who made a gun threat. (*Id.* ¶¶ 122–24.)

Plaintiffs allege that Levek spoke to law enforcement about continually having issues with families living in a Whitefish Bay neighborhood that is known to have a higher proportion of Black residents. (*Id.* ¶¶ 134–36.) Plaintiffs allege that despite R.L. subsequently admitting that he insulted K.K. with the intent to humiliate him (*id.* ¶ 93) and had shoved him (*id.* ¶ 194), neither R.L. nor C.L. were punished for their part in the incident (*id.* ¶ 195). Plaintiffs allege that K.K. was treated differently than R.L. and C.L. because of his race. (*Id.* ¶ 381.)

Defendants argue that Plaintiffs' complaint fails to contain factual allegations that plausibly connect K.K.'s discipline to his race. (Docket # 26 at 17.) They argue, citing

24

*McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011) in support, that so long as the allegations in the complaint give rise to an obvious alternative explanation that is entirely consistent with lawful conduct, the complaint does not state an equal protection claim. (*Id.*) *McCauley*, however, does not stand for this proposition. Rather, the court was discussing the level of factual specificity *Twombly* and *Iqbal* require, finding that the more complex the claim, the more detail required. 671 F.3d at 616–17. Thus, for a discrimination claim that is "more complicated and counterintuitive," it may not survive a motion to dismiss if the factual allegations "are entirely consistent with lawful conduct"; thus making it less clear the nature of the alleged equal protection violation. *Id.* at 619.

In this case, however, as to Levek and Henningsen, the nature of the alleged equal protection violation is not complicated. Plaintiffs allege that in conducting an investigation into an incident involving two white students and one Black student, the Black student was treated less favorably during the investigation and was ultimately punished when the other students were not. The amended complaint further contains factual allegations that plausibly tie these actions to K.K.'s race, such as Levek's statements to law enforcement regarding the general difficulties they had with "these families" living in the apartments and townhouses in Whitefish Bay. For these reasons, Plaintiffs' equal protection claims regarding the suspension decision against Levek and Henningsen will move forward. However, the equal protection claims regarding the suspension decision against Lemke and Thomsen are dismissed.

4. *Equal Protection-Bullying and Harassment Claim Against Levek, Henningsen, Lemke, Thomsen, O'Connor, and Rose (Count V)*

In Count V, Plaintiffs allege that Henningsen, Levek, Lemke, Thomsen, O'Connor, and Rose declined to address known harassment of K.K. based on his race. (Am. Compl. ¶¶ 408–414.) The state cannot "selectively deny its protective services to certain disfavored

Case 2:24-cv-01076-NJ    Filed 04/25/25    Page 25 of 33    Document 39

minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989).

Once again, as to Lemke and Thomsen, there are no factual allegations that would support an equal protection claim against either of these defendants. The only allegations related to Lemke and Thomsen regarding the alleged bullying incidents is Lemke's alleged failure to review White's harassment complaint against R.L. and C.L. in rendering his November 13 decision (Am. Compl. ¶¶ 211, 231) and Thomsen upholding Henningsen's denial of the harassment complaints (*id.* ¶ 252–57). For the same reasons Plaintiffs' equal protection claim in Count III is dismissed against Lemke and Thomsen, their Count V equal protection claim is also dismissed against Lemke and Thomsen.

Plaintiffs' claims against O'Connor, Rose, Levek, and Henningsen, however, will be allowed to proceed. Again, O'Connor and Rose are the principal and associate principal of Whitefish Bay Middle School, respectively. (*Id.* ¶¶ 15, 37.) Plaintiffs allege that the district's bullying policies allowed administrators to take disciplinary action against bullying and harassment occurring off of school property if the conduct is determined to be so severely disruptive of the education process that it markedly impedes the day-to-day interaction of the school. (*Id.* ¶ 43.) Plaintiffs allege, however, that O'Connor and Rose refused to address bullying and harassment of K.K. and other Black students on the grounds that the conduct occurred off school property while simultaneously investigating bullying and harassment involving white students that also occurred off school property. (*Id.* ¶¶ 44, 318, 323, 329, 332–33, 336.) Plaintiffs further allege that O'Connor and Rose disciplined K.K. more harshly for an incident involving a white student. (*Id.* ¶ 318.)

Plaintiffs similarly allege that Levek and Henningsen address disciplinary issues differently depending on race. They allege that in October 2023, a white student told athletic staff that another student had touched him inappropriately and Henningsen immediately notified police and imposed athletic and disciplinary consequences (*id.* ¶ 328) whereas when White's sister attempted to address issues her daughter was having with another student, Levek and Henningsen told her that the student was making them take time away from their families and that she would "end up in MPS" (*id.* ¶ 340). Plaintiffs further allege that in September 2023, Levek and Henningsen informed police that two Black students created an Instagram page stating "this game gone be fun" with two gun emojis, despite the fact that the football game had passed so no actual threat existed, resulting in the students getting disorderly conduct citations (*id.* ¶ 327), whereas in November 2023, a white student typed search queries into his school Chromebook including "how to bomb a school" and while Henningsen notified the police, she told them she did not believe there was any risk and that the student was trying to be funny (*id.* ¶ 330).

As to Levek, Henningsen, O'Connor, and Rose, the amended complaint plausibly asserts an equal protection claim against them in Count V. As to Lemke and Thomsen, however, Count V is dismissed.

### 5. Equal Protection-Bullying and Harassment Claim Against the School Board (Count VI)

In Count VI, Plaintiffs allege that the district has a widespread custom of ignoring Black students' complaints about misconduct by other students and failing to intervene to protect Black students from bullying, harassment, and threats. (*Id.* ¶¶ 416–17.) Plaintiffs further allege that the district punishes Black students more harshly than white students. (*Id.* ¶ 418.) To succeed on a "widespread custom" theory under *Monell*, a plaintiff must

27

demonstrate that the practice is widespread and that the specific violations complained of were not isolated incidents. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). At the pleading stage, "a plaintiff pursuing this theory must allege facts that permit the reasonable inference that the practice is so widespread so as to constitute a governmental custom." *Id.* Plaintiffs allege multiple incidents over several years in which administrators in the district allegedly treated Black students more harshly than white students and failed to investigate harassment complaints made by Black students while investigating harassment claims made by white students. (Am. Compl. ¶¶ 304–40.) Thus, the amended complaint satisfies this standard at this stage and this *Monell* claim will move forward.

  6. *First Amendment Retaliation (Count VII)*

  In Count VII, Plaintiffs allege that Levek and Thomsen retaliated against White for exercising her First Amendment right to peacefully protest. Specifically, Plaintiffs allege that White communicated to Sergeant Rossman that she planned to peacefully protest the administrator's decision to discipline K.K. by standing with a group of supporters across the street from the high school during the homecoming dance. (Am. Compl. ¶ 435.) Plaintiffs allege that Sergeant Rossman communicated White's plans to Levek and Thomsen, who instructed Sergeant Rossman to tell White that she would be immediately arrested if she set foot on school property. (*Id.* ¶¶ 437–42.) Plaintiffs allege that as a result of the threat of arrest, White did not hold her intended protest. (*Id.* ¶ 443.)

  To succeed on a First Amendment retaliation claim, a plaintiff must establish that (1) she engaged in activity protected by the First Amendment, (2) she suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was a "at least a motivating factor" in the Defendants' decision to take the retaliatory

action. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008). Defendants do not contend that Plaintiffs' amended complaint fails to sufficiently allege that White engaged in activity protected by the First Amendment. Rather, Defendants argue that the facts as alleged do not plausibly establish the existence of either the second or third elements of the claim.

The crux of Defendants' argument is that Plaintiffs allege that Levek and Thomsen said she would be arrested if she set foot on school property; however, Plaintiffs allege that White intended to hold her protest *off* of school property. Defendants argue that a threat of arrest if one steps onto school property would not deter one from holding a protest *off* of school property. (Docket # 25 at 25.) Whether the Defendants' alleged conduct would likely deter a person of ordinary firmness from continuing to engage in protected activity is an objective test. *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011). Plaintiffs argue that to be told that school administrators are prepared to have you arrested for setting foot on your child's school grounds "is no small thing" and one could infer that "it's a frightening and humiliating enough experience to chill one's willingness to speak out." (Docket # 34-1 at 22.)

But Plaintiffs do not allege Defendants threatened to have White arrested for protesting. Rather, Plaintiffs essentially allege that Defendants threatened to have White arrested if she trespassed on school grounds. *See U. S. Postal Serv. v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 129 (1981) ("[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government."). While White asserts that the alleged threat caused her to cancel her protest, again, the standard is an objective one. Thus, I find that Plaintiffs have failed to allege that White suffered a deprivation that would likely deter First Amendment activity in the future. Count VII is dismissed.

29

7. *Viewpoint Discrimination/Prior Restraint (Count VIII)*

In Count VIII, Plaintiffs allege that when White appealed the determinations of the discrimination complaint, the suspension appeal, and the two harassment appeals to the School Board, Plaintiffs were informed that the Board would hear the appeals in a series of two closed-session meetings and that during the closed meetings, it would require that "that any students other than K.K. be referenced simply as 'Student A, Student B, Student C, etc.'" and that administrators "be referenced simply as 'Administrator A, Administrator B, Administrator C, etc.'" (*Id.* ¶¶ 260–62.) Plaintiffs allege that they were told the Board would not hold the hearings if they did not agree to those requirements. (*Id.* ¶ 265.)

Plaintiffs further allege that during the second of the two meetings, several community members came to speak in support of White and K.K. during the public comment period before the board went into closed session (*id.* ¶ 273) and the Board also applied the rule prohibiting discussion of administrators by name to the public comment period (*id.* ¶ 274). Plaintiffs allege that the Board does not usually require members of the public who are speaking in public comment to refer to administrators by letters instead of name and did so because it knew the speakers were likely to criticize administrators for their handling of racial issues in the district. (*Id.* ¶¶ 275–76.) Plaintiffs allege that the Board's restriction on identifying administrators was a prior restraint and content-based restriction that constituted unlawful viewpoint discrimination. (*Id.* ¶ 454.)

Plaintiffs fails to show that the Board's requirement that the speakers refer to administrators by pseudonym constitutes an unlawful prior restraint. The Constitution prevents governmental actors from forbidding speech that is protected under the first amendment. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). "Threatening penalties for

30

future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Id.* Plaintiffs do not allege, however, that either White, K.K., or any of their supporters were either excluded from the Board meeting or prohibited from criticizing the administration. Rather, they simply allege that when speaking of students and administrators, they were required to refer to them by a pseudonym rather than by their name. Plaintiffs do not allege that the use of the students' and administrators' actual names is constitutionally protected speech.

As to Plaintiffs' claim that the requirement of pseudonyms constitutes viewpoint discrimination, to succeed on such a claim, Plaintiffs must show that (1) government officials regulated their speech and (2) that the regulation was motivated by the ideology or the opinion or perspective that they wished to express. *DeJong v. Pembrook*, 662 F. Supp. 3d 896, 914 (S.D. Ill. 2023). But again, Plaintiffs do not allege that they were prevented from criticizing administrators regarding handling of racial issues in the district, or on any other subject matter. Rather, they were simply required to refer to the administrators by pseudonym rather than by their actual name. Again, Plaintiffs fail to allege that restricting the use of the administrators' names plausibly alleges a regulation based on ideology, opinion, or perspective. For these reasons, Count VIII is dismissed.

## CONCLUSION

Plaintiffs allege multiple claims against the Whitefish Bay School Board and several administrators in the district. Defendants moved to dismiss Plaintiffs' Amended Complaint in its entirety. For the reasons explained above, the following claims are dismissed for failure to state a claim:

31

- Count I: Procedural Due Process Violations – as to O'Connor, Rose, the School Board, Lemke, and Thomsen.

- Count II: Procedural Due Process – *Monell* claim against the Board as to Lemke and Thomsen.

- Count III: Equal Protection – Discipline – as to Lemke and Thomsen.

- Count V: Equal Protection – Bullying and Harassment – as to Lemke and Thomsen.

- Count VII

- Count VIII

Plaintiffs are allowed to proceed on the following claims:

- Count I: Procedural Due Process Violations – as to Levek and Henningsen regarding 3-day suspension.

- Count II: Procedural Due Process – *Monell* claim against the Board as to Levek and Henningsen.

- Count III: Equal Protection – Discipline – as to Levek and Henningsen.

- Count V: Equal Protection – Bullying and Harassment – as to O'Connor, Rose, Levek, and Henningsen.

- Count VI – Equal Protection - Bullying and Harassment – *Monell* claim against the Board.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that Defendants' motion to dismiss the Amended Complaint (Docket # 25) is **GRANTED IN PART AND DENIED IN PART**. As no further claims remain against Defendants Tim Lemke and John Thomsen, they are

dismissed as parties to this case. The clerk of court will contact the parties regarding further scheduling in this matter.

Dated at Milwaukee, Wisconsin this 25th day of April, 2025.

BY THE COURT:

_____

NANCY JOSEPH
United States Magistrate Judge